**James J. KEVLIK, et al., Plaintiffs, Appellees,**

v.

**David B. GOLDSTEIN, et al., Defendants, Appellees.**

**Town of Derry, Defendant, Appellant.**

No. 83–1397.

United States Court of Appeals, First Circuit.

Argued Oct. 7, 1983.

Decided Jan. 11, 1984.

Nourie, Manchester, N.H., were on brief, for defendant, appellant.

Robert W. Gardner, Jr., Hollis, N.H., with whom Bruce N. Finkle, and Gardner & Finkle, Hollis, N.H., were on brief, for appellees.

Before BOWNES and BREYER, Circuit Judges, and SMITH,* Senior District Judge.

BOWNES, Circuit Judge.

Defendant-appellant, Town of Derry, New Hampshire, appeals a court order disqualifying its counsel, Wiggin & Nourie, from continuing to represent it in a civil suit pending in the United States District Court for the District of New Hampshire. Wiggin & Nourie is, of course, the real party in interest. This appeal is pursuant to an order of the district court allowing an interlocutory appeal under 28 U.S.C. § 1292(b).[1]

The district court disqualification order is based on a violation of professional ethical conduct, "the appearance of professional impropriety," as specified in the Model Code of Professional Responsibility, Canon 9.[2] The plaintiffs-appellees, claim specifically a potential breach of the attorney-client privilege, in derogation of a former client's rights, and in violation of Model Code of Professional Responsibility, Disciplinary Rule (DR) 4–101(B)(1).[3] We affirm the district court's disqualification order.

The factual background giving rise to this appeal is as follows. The underlying civil suit, based on 42 U.S.C. § 1983, relates to facts that occurred on November 14,

Karen L. Heller, Manchester, N.H., with whom Jeffrey B. Osburn, and Wiggin &

* Of the District of Montana, sitting by designation.

1. 28 U.S.C. § 1292(b) reads in pertinent part:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

2. "A lawyer should avoid even the appearance of professional impropriety." Model Code of Professional Responsibility Canon 9.

3. DR 4–101(B)(1) reads:
Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.

1980, when an automobile operated by James J. Kevlik in which John Southmayd and Jan J. Kevlik were passengers was stopped by the police in Derry, New Hampshire. According to the Kevliks' civil complaint, they, along with John Southmayd, were unlawfully arrested, beaten, and denied adequate medical care by certain members of the Derry police force. The complaint also alleges that James Kevlik was denied the right to a chemical test after having been charged with driving under the influence. And, finally, the Kevliks allege that three Derry police officers knowingly submitted false statements and suppressed material evidence relative to the arrest.

The official criminal charges levied against the three defendants were: Southmayd, resisting arrest; James Kevlik, two counts of simple assault and resisting arrest; and Jan Kevlik, simple assault and resisting arrest. All three codefendants were subsequently acquitted of these charges. John Southmayd successfully and independently of the Kevliks subsequently settled his civil claim against the Town of Derry without filing a suit.

Prior to Southmayd and the Kevliks being acquitted of the criminal charges, Southmayd, accompanied by his father, a business client of the Wiggin & Nourie law firm, sought legal advice about the criminal charges. According to Southmayd's affidavit, he paid Robert B. McNamara, an associate of the firm, a $200 retainer fee and he and his father had a consultation with McNamara in which he "explained in full detail the events that happened on the night of [his] arrest." McNamara filed an appearance on Southmayd's behalf in the Derry District Court on November 28, 1980. Southmayd stated in his affidavit that as a result of McNamara's incredulity as to the events of November 14, Southmayd discharged him a day or two after the initial conference. The affidavit further states that during the conversation about terminating McNamara's services, McNamara informed Southmayd that he had to remove himself from the case since he represented the Derry Police Department's insurer. McNamara's affidavit does not contradict any of Southmayd's averments.

Southmayd then retained new counsel, and successfully pursued the out-of-court settlement with the Town of Derry. Consequently, Southmayd is not a party to the Kevliks' present section 1983 action.

The Kevliks retained Robert Gardner as their counsel. After learning that McNamara had filed an appearance on Southmayd's behalf, Gardner called McNamara and asked him if he wished to join in a civil action against the Town of Derry in the Southmayd-Kevlik matter. McNamara informed Gardner that he had withdrawn from the case.

About a year and a half after filing their complaint against the Town of Derry, the Kevliks, through their attorney, moved to disqualify Wiggin & Nourie, asserting that Southmayd would be called as a witness in the civil rights action and a member of the firm, McNamara, was privy to privileged attorney-client information and, thus, there existed a conflict of interest.

The issues before us are:

1.  whether plaintiffs lack standing to pursue the disqualification claim;

2.  whether plaintiffs delayed too long in raising the claim;

3.  whether an attorney-client privilege existed; and, finally

4.  whether there is any violation of the Model Code of Professional Responsibility.

As this appears to be a case of first impression in this circuit, we not only must determine the merits of appellant's claims, but also must establish the appropriate standard of review.

We first note that Rule 4(d) of the Rules of the United States District Court for the District of New Hampshire provides, "The Code of Professional Responsibility of the American Bar Association shall be the stan-

dards of conduct for all attorneys practicing before this court." [4]

*The Standard of Review*

■ We start with the generally accepted rule that the district court has the duty and responsibility of supervising the conduct of attorneys who appear before it. *Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983); *United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.), *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); *United States v. Shepard,* 675 F.2d 977, 979 (8th Cir.1982); *Trone v. Smith,* 621 F.2d 994, 999 (9th Cir. 1980); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 271 (2d Cir. 1975); *Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1385 (3d Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973).

■ Because the district court is vested with the power and responsibility of supervising the professional conduct of attorneys appearing before it, we apply the "abuse of discretion" standard of review. We will not disturb the district court finding unless there is no reasonable basis for the court's determination. This is the standard of review followed by the majority of circuits that have considered the question. *See, Trust Corp. of Montana,* 701 F.2d at 87 (9th Cir.); *United States v. Agosto,* 657 F.2d at 970 (8th Cir.); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 131 (2d Cir.1976); *Redd v. Shell Oil Co.,* 518 F.2d 311, 314 (10th Cir.1975); *Richardson v. Hamilton International Corp.,* 469 F.2d at 1386 (3d Cir.).

We decline to follow the "clearly erroneous" test used by the Fifth Circuit, and alluded to by the Town of Derry in its brief. *See Cossette v. Country Style Donuts, Inc.,*

647 F.2d 526, 530 (5th Cir.1981) (in disqualification cases, Fifth Circuit subscribes to "clearly erroneous" standard while simultaneously examining district court's "application of relevant ethical standard"); *Brennan's Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 171 (5th Cir.1979); *Woods v. Covington County Bank,* 537 F.2d 804, 810 (5th Cir.1976); *but see, In re Gopman,* 531 F.2d 262, 266 (5th Cir.1976) ("The proper standard for our review of a disqualification order is whether the trial judge abused his discretion").

*Standing*

■ Appellant first argues that the plaintiffs lack standing to pursue a disqualification order because only the former client, in this instance Southmayd, may raise a disqualification motion. We disagree. The Model Code of Professional Responsibility, DR 1–103(A) clearly requires that an attorney come forward if he has knowledge of an actual or potential violation of a Disciplinary Rule: "A lawyer possessing unprivileged knowledge of a violation of DR 1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." It is evident that the disqualification motion, although in the name of the plaintiffs, was actually brought by Attorney Gardner.

Our inquiry involves a three-step analysis. We first look to DR 1–103(A), the Code's general rule of self-regulation. Next, we determine whether, as DR 1–103(A) requires, there has been a violation of DR 1–102. Here, DR 1–102(A)(1) is the implicated rule: "A lawyer shall not violate a Disciplinary Rule." And, finally, applying the facts of the case to the correlative Disciplinary Rule, we note the broad mandate of Canon 4 of the Code: "A lawyer

---

**4.** We are cognizant of the fact that on August 2, 1983, the American Bar Association adopted the Model Rules of Professional Conduct, which in some areas vary substantively from the earlier Model Code of Professional Responsibility. However, in the instant case, the end result, whether resolved under the Model Rules of Professional Conduct or under the Model Code of Professional Responsibility, would be the same. But, as the Model Code of Professional Conduct was in effect at the time of the disqualification motion, we use it as our controlling reference.

should preserve the confidences and secrets of a client." DR 4–101(B) provides:

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

The Fourth and Fifth Circuits have held that disqualification may rightly be sought by opposing counsel even though he/she is not representing the aggrieved client. *United States v. Clarkson,* 567 F.2d 270, 271 n. 1 (4th Cir.1977) (member of bar obligated to call to court's attention "facts justifying a disqualification of counsel"); *Brown & Williamson Tobacco Corp. v. Daniel International Corp.,* 563 F.2d 671, 673 (5th Cir. 1977) ("Appellant has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations in the case."); *In re Gopman,* 531 F.2d at 265 ("When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention."); *See also Black v. State of Missouri,* 492 F.Supp. 848, 861 (W.D.Missouri 1980) (where public interest great, "the district defendants should be entitled to raise any apparent conflicts of interest which might undermine the validity of proceedings in this case."); *Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 345 F.Supp. 93, 98 (S.D.N.Y.1972) (attorney is duty bound to report any alleged violation of ethics).

Based on DR 1–103(A) of the Model Code of Professional Responsibility and the cases cited, we find that the attorney for the Kevliks had standing to bring the motion for disqualification.

*The Delay in Raising the Claim*

We have considered carefully appellant's assertion that the motion for disqualification was brought purely for tactical purposes. Be that as it may, we cannot, in the face of a breach of professional duty, ignore the wrong because appellees' counsel neglected to discern the conflict earlier, or even opted to delay litigation by raising the motion near the commencement of trial. We must note that it is hard to see how delay alone will benefit the plaintiffs and prejudice the defendant. In any event, the need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion. We agree with the Second Circuit's reasoning in *Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241 (2d Cir.1979), and *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973). In *Nyquist,* the Second Circuit held that dilatory disqualification motions would be granted when (1) the court's confidence in the attorney's vigorous representation of his or her client was threatened, or (2) the attorney was in a position to use privileged information to the unfair advantage of the new client. *Nyquist* at 1246. Addressing the question of delay, *Emle* held that "disqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility." *Emle* at 574.

We are aware that disqualification motions can be tactical in nature, designed to harass opposing counsel, and have, therefore, kept in mind that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." Preamble to Model Rules for Professional Conduct. However, the record before us shows no tangible evidence of such improper motive. We note, too, that the motion was brought prior to trial, and not during it.

Appellant also argues that it will be denied its choice of counsel if the Wiggin & Nourie firm is disqualified. This is a civil case, and, unlike criminal cases, there is no rigorous sixth amendment protection of the right to the choice of counsel. *United*

*States v. Cunningham,* 672 F.2d 1064, 1071 (2d Cir.1982); *United States v. Armedo-Sarmiento,* 524 F.2d 591, 592 (2d Cir.1975). We think it more important that unethical conduct be prevented than that defendant have an unfettered right to counsel of its choice.

*The Existence of a Privileged Communication*

▮ Next, appellant argues that there was no privileged communication because of the presence of a third party. The guiding principle in determining whether or not there exists a privileged attorney-client relationship is the intent of the client. The key question in determining the existence of a privileged communication is "whether the client reasonably understood the conference to be confidential." McCormick on Evidence, § 91 at 189 (1972). *See also,* H.J. Drinker, Legal Ethics, 135 (1953) (communication remains privileged where "third party was present in such capacity as to be identified with the client"); *Hearn v. Rhay,* 68 F.R.D. 574, 579 (E.D.Wash.1975) (intent of the party is determinative). The law in this circuit also looks to the intent of the client. In *United States v. Bigos,* 459 F.2d 639 (1st Cir.1972), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972), we held that an inviolate and privileged communication existed where an indicted defendant's father was present with him at the consultation with his attorney: "While we agree that the presence of a third party commonly destroys the privilege, it does so only insofar as it is indicative of the intent of the parties that their communication not be confidential." *Id.* at 643.

We turn to the facts of the instant case to determine the intent of the parties. Looking to the record and Southmayd's affidavit, it is evident, first, that Southmayd's

father had been a business client of the Wiggin & Nourie law firm. Based on his prior dealings with the firm, we can assume that he guided his son to it. Acting in a normal and supportive parental fashion, the father was present with his son throughout the conference with Attorney McNamara. Southmayd's affidavit states that he "explained in full detail the events that happened on the night of [his] arrest." Southmayd paid McNamara a $200 retainer fee and McNamara filed an appearance for him in the pending criminal case. We can only conclude that it was Southmayd's intention, as well as that of his father, that the consultation with McNamara was to be confidential and privileged.

▮ That McNamara later withdrew as Southmayd's counsel (or was discharged) does not destroy the privilege. The privilege continues after termination of the lawyer-client relationship and extends to other members of the firm. *American Can Company v. Citrus Feed Company,* 436 F.2d 1125, 1128–29 (5th Cir.1971); *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953).[5] It is worth noting here that under Ethical Consideration 4–4 of the Model Code of Professional Responsibility, the "ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of the information or the fact that others share the knowledge."

*Whether There Was Any Violation of the Model Code of Professional Responsibility*

▮ This issue requires an examination of the scope and purpose of the attorney-client privilege. It is generally accepted that the purpose of the attorney-client privilege is threefold: (1) to encourage free discussion by the client; (2) to relieve the

---

5. In the case of large firms, it has been held that even if there exist meticulous screening procedures to insulate an attorney from other firm members, there is still a rebuttable presumption that confidential information was shared with the entire firm. *See, e.g., Lasalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983). Other cases have established an irrebuttable presumption that the confidenc-

es are shared by all members of the firm. *See, e.g., State of Arkansas v. Dean Foods Products Co., Inc.,* 605 F.2d 380 (8th Cir.1979).

We do not reach this issue for two reasons: first, Wiggin & Nourie is a firm of approximately twenty-five members; second, it has not suggested that information received from Southmayd was not transmitted to or learned by other members of the firm.

attorney of the onus of determining on a good faith basis whether a communication is privileged, *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d at 570–71; and (3) to deter the advertent or inadvertent use of privileged communications to the advantage or disadvantage of a new client. *NCK Organization Ltd. v. Bregman,* 542 F.2d at 135.

▇ The privilege belongs to and may be waived only by the former client; the attorney may not terminate the privilege unilaterally. DR 4–101(B)(1); A. Weinstein & M. Berger, Weinstein's Evidence § 503(c)[01] (1982). And, an attorney may not "use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure." DR 4–101(B)(3). There has been no consent by the former client here.

In *United States v. Shepard,* 675 F.2d 977 (8th Cir.1982), the court held that there was a conflict of interest where an attorney had previously represented a grand jury witness who would later testify at the trial. The court reasoned that in such a successive representation, he/she "may misuse confidential information obtained from the former client, or may fail to fully cross-examine for fear of misusing confidential information." *Id.* at 979. The Second Circuit has held to this same effect:

> The principle is well established that an attorney should be disqualified from opposing a former client if during his representation of that client he obtained information "relevant to the controversy at hand", *United States v. Standard Oil Co., supra,* 136 F.Supp. [345] at 353, or "pertaining to the pending matter", *General Motors Corp. v. City of New York, supra,* 501 F.2d [639] at 651 [ (2nd Cir.1974) ] (emphasis in original).

*United States v. Ostrer,* 597 F.2d 337, 340 (2d Cir.1979).

Appellants argue that *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982) is controlling. *Cunningham* was a criminal case where the court balanced a witness's right to confidentiality against the defend-

ant's sixth amendment right to counsel. Defendant's counsel had successfully won many earlier legal battles for his client, and the court reasoned that the defendant's strong reliance on and the extraordinary success of his attorney tipped the balance in his favor. The witness did not join the government's motion to disqualify the defendant's attorney. The defendant's attorney had briefly advised the witness, but ostensibly had not garnered any information detrimental or favorable to his current client. Defendant and witness were longtime friends, closely linked together in various episodes of alleged wrongdoing. The court balanced ethical obligations and the important sixth amendment right to the choice of counsel in a criminal case. In this fact pattern, the Second Circuit found the right to counsel a more compelling interest than preservation of the privilege.

The other side of the coin is *United States v. James,* 708 F.2d 40 (2d Cir.1983). In *James,* the court, relying on *Cunningham,* balanced the right to choice of counsel against the potential revelation of confidential attorney-client communications. Here, the witness did not waive his privilege, and the court found that an unfair advantage was likely to inure to the defendants if the witness were questioned. Therefore, the court affirmed the disqualification order. *Id.* at 46.

▇ As pointed out earlier, a criminal case requires a stringent analysis because of the sixth amendment right to counsel. In a civil case, however, where there are the two competing interests, choice of counsel and the protection of a privileged communication, we lean toward the protection of the communication, unless, of course, the witness voluntarily waives it.

▇ The relevant test in disqualification cases involving a conflict of interest based on the actual or potential threat of the violation of the attorney-client privilege is the "substantially related" test, enunciated by Judge Weinfeld in the seminal case, *T.C. Theatre Corp. v. Warner Bros. Pictures,*

*Inc.,* 113 F.Supp. 265, and echoed in other cases addressing the question of attorney disqualification:

Rather, I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*Id.* at 268–69. *See Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983) ("a lawyer may not represent an adversary of his former client if the subject matter of the two representations is 'substantially related,' which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second"); *Trust Corp. of Montana,* 701 F.2d at 87; *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir. 1980); *State of Arkansas v. Dean Foods Products Co., Inc.,* 605 F.2d 380, 383 (8th Cir.1979); *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 (7th Cir. 1978); *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 608 (8th Cir.1977); *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 89 (5th Cir.1976); *Redd v. Shell Oil Co.,* 518 F.2d 311, 315 (10th Cir.1975); *Richardson v. Hamilton,* 469 F.2d at 1385.

In this case the Kevliks' civil action arises from the same body of facts that caused Southmayd to seek legal counsel from the Wiggin & Nourie firm. The information that he gave to an associate of the firm undoubtedly contained material relevant to the Kevliks' case. Therefore, there is a substantial relationship between the information imparted by Southmayd at the con-

sultation and the issues in the pending civil litigation.

The conclusion is inescapable that there exists not only the appearance of impropriety, as the district court found, but a conflict of interest based on the actual or potential use of privileged information. The only way the conflict of interest can be resolved is by termination of Wiggin and Nourie's role as attorney for the Town of Derry.

We hold: first, that Kevliks' attorney had standing to bring the motion for disqualification; second, that the delay in bringing the motion is not a bar; third, there did and does exist an attorney-client privilege between Southmayd and his former counsel; fourth, there is a conflict of interest in violation of the Model Code of Professional Responsibility that prevents Wiggin & Nourie from continuing to represent the Town of Derry in the pending law suit.

It follows, therefore, that the district court did not abuse its discretion in disqualifying Wiggin & Nourie.

*Affirmed.*