BEATRICE L. DELOURY *vs.* B. DAVID DELOURY, JR.

Middlesex.  May 15, 1986 — August 1, 1986.

Present: ARMSTRONG, KAPLAN, & BROWN, JJ.

*Attorney at Law,* Disqualification, Representation of differing interests.
  *Practice, Civil,* Appeal from interlocutory order.

A preliminary consultation between a woman and an attorney concerning the
  possibility of her obtaining a divorce, in the course of which she disclosed
  to the attorney certain information of an intimate character, followed by
  the woman's request four months later that the attorney undertake some
  preliminary legal work bearing on a prospective divorce, for which she
  received a bill, later cancelled, for $500, warranted a Probate Court
  judge in concluding that an attorney-client relationship had been estab-
  lished and that a member of the attorney's firm was precluded from
  representing the woman's husband in a divorce proceeding commenced
  about one year later by different counsel for the woman. [615-616]
  BROWN, J. concurring.
An order disqualifying a party's attorney in a divorce action was immediately
  appealable under the doctrine of "present execution" as applied by the
  Supreme Judicial Court in *Borman* v. *Borman,* 378 Mass. 775, 778-781
  (1979). [616]

COMPLAINT for divorce filed in the Middlesex Division of
the Probate and Family Court Department on October 7, 1985.

A motion to strike the appearance of the defendant's counsel
was heard by *Edward M. Ginsburg,* J.

*Richard D. Packenham* for the defendant.
*Paul J. McCallum* for the plaintiff.

KAPLAN, J. On this appeal, we deal with a question of
"successive representation — opposing a former client." See
Kaufman, Problems in Professional Responsibility 113-138
(1984).

A judge of the Probate Court, upon application of the plaintiff
wife in her suit for divorce, held the attorney for the husband
disqualified to represent him because a member of the attorney's

firm had previously encountered the wife in circumstances to be described. We agree with the judge. First, we show the result follows, by reasonable implication, from *Mailer* v. *Mailer,* 390 Mass. 371 (1983). Second, we speak briefly in more general terms. Third, we mention the question of the appealability of the order.

1. (a) In *Mailer,* the wife, later the plaintiff in a suit for divorce, called on an attorney, Mr. Monroe L. Inker, in June, 1973, in order to learn about the procedure for securing a divorce in Massachusetts. She gave the attorney's secretary some "vital statistics" about her husband (the well-known author) and herself and identified their property. This information the secretary entered on a prepared form which the attorney read before or during his interview with the wife. During the hour-long interview, the wife spoke of the husband's earnings and showed the attorney a newspaper article about the husband's presence at a college reunion accompanied by a woman whom he called his "fifth wife." She said she spoke also of her conduct as a wife and mother and of the husband's conduct toward her; the attorney denied that these matters were discussed. The attorney explained the procedure for attachments of real estate but (so he stated) did not discuss the grounds for divorce except to note the inference of adulterous conduct that could be drawn from the remark about a fifth wife. The interview ended with the attorney telling the wife that if she wished him to represent her she would have to prepare a life history and pay a retainer fee of $2,400.

The wife had no further contact with the attorney and did not retain him. She retained different counsel in July, 1974, who brought the suit for divorce in 1976. Finding that the husband was being represented in the suit by Mr. Inker, counsel moved to disqualify him. The motion was heard in October, 1978, and was denied. From the judgment of divorce nisi, the wife appealed, claiming error in the refusal to disqualify (and error also in the material parts of the judgment).

In affirming, the court said the problem was one of reconciling the right of a person to counsel of his choice with the societal interest in maintaining the highest standards of profes-

sional conduct. The court would have been assisted, it said, if the judge had made findings, but, the evidence having been reported, the judge's decision would be taken to import the findings needed to sustain it, if there was evidence that could support them. There was such evidence. The judge was not required to believe that the wife disclosed intimate details of the marriage. The financial and other information she did disclose was either of record in the divorce suit or otherwise known to the defendant. Indeed, "[m]ost, if not all, of the information used at trial could have been obtained by any curious member of the public." *Id.* at 374. Was there an attorney-client relationship? The fact that the wife had not paid a fee did not negate conclusively that relationship, but evidently was relevant. Although not conclusive, the time factor was relevant, and here a lengthy interval of five years had passed from the interview to the time of hearing.

The question of disqualification was "close" (*id.* at 373); "the facts of this case probably bring us as close to the outer limits [of propriety] as we shall want to go." *Id.* at 375. The court also said: "[I]n cases of doubt, counsel must resolve all questions against the acceptance of employment whenever such acceptance may impinge upon the interests of his present and former clients." *Ibid.*

(b) We turn to the facts in the present case. In May, 1984, the wife, Beatrice,[1] called on Attorney Robert F. McGrath. In an interview which ran for more than an hour, she gave the attorney a family history and financial information, including reference to the husband David's two business interests — real estate and a travel agency — which the attorney entered on an interview form. As "reason for breakup" she said David had fired her from his real estate office after her thirteen years of service there; and she named as David's girl friend a woman who was vice president and a 10% owner of the travel agency.

---

[1] She was accompanied by her grown daughter Cynthia for her "moral support." If the interview involved any confidences, its character was not changed by Cynthia's presence. See *Kevlik* v. *Goldstein,* 724 F.2d 844, 849 (1st Cir. 1984), citing McCormick, Evidence § 91, at 189 (2d ed. 1972), and Drinker, Legal Ethics 135 (1953).

The attorney outlined for Beatrice the Massachusetts divorce law and said he would be glad to represent her. She said she was undecided about seeking a divorce. He handed her a packet of material on the divorce law; a questionnaire about assets and liabilities and a budget form, both to be filled out; and a fees form to be completed if she decided to go ahead with the divorce.

In September, Beatrice called the attorney's office and, although still uncertain about suing, asked him "to do some initial work re divorce,"[2] which consisted of examining public records about real estate holdings of David: she testified that she believed she had an interest in them. The attorney delegated the task to an associate, and in October sent her the examined data. He billed her about $500 for the work. In January or February, 1985, however, he cancelled the bill (the record does not reveal why he did so).

In fact, Beatrice retained the firm of White, Inker, Aronson, P.C., in September or October, 1985, and complaint for divorce was filed in October. Appearing for David was a member of Mr. McGrath's firm (to be treated, for the present legal purpose, as Mr. McGrath would be). Beatrice's motion to disqualify him was heard in January, 1986, with evidence as outlined above.

(c) As noted, we agree with the trial judge that the line of impropriety, so nearly approached in *Mailer,* was crossed in the present case, justifying disqualification. We have the transcript of hearing and exhibits and the judge's memorandum, findings of fact, and conclusions of law.

In *Mailer,* there was doubt whether any attorney-client relationship had arisen. Here, besides the initial interview, we have Beatrice's request that Mr. McGrath do legal work bearing on a prospective divorce; work actually done in that behalf; and a bill rendered for that work — although collection was voluntarily relinquished. So an attorney-client relationship existed. The court in *Mailer* deprecated the claim that confi-

---

[2] Quoted from the memo of Mr. McGrath's secretary to him about her telephone conversation with Beatrice.

dences had been imparted to the attorney. Here Beatrice "believed," the judge found, "that the consultation was confidential and that what she told to Mr. McGrath, including her reason for wanting a divorce, would be held in confidence." Such a belief on the part of the client is itself entitled to respect. See *Kevlik* v. *Goldstein,* 724 F.2d 844, 849 (1st Cir. 1984). Cf. *United States* v. *Bigos,* 459 F.2d 639, 643 (1st Cir.), cert. denied, 409 U.S. 847 (1972). Moreover, there was a communication of an intimate character in the disclosure by Beatrice of her humiliation by her husband and of her knowledge that her husband was philandering and of the identity of the woman. In asking the attorney to follow David's real estate transactions in the public records, Beatrice was indicating a concern with the asset picture and, as appears, pursuing a suspicion or belief that she might have some present interest in the properties. In a divorce context, we think these factors suggest confidence.[3] The judge laid emphasis on the fact that the time lapse in the present case was much shorter than in *Mailer.* This goes to the client's possible sense of betrayal; to the freshness of the impression of the client retained by the attorney; and to public perception of the stability or lack of it of attorneys' loyalties. The judge also noted that the decision of *Mailer* had given due warning to the Bar of the restraint that was expected of attorneys for the future.

2. The canons and disciplinary rules in force in the Commonwealth do not deal squarely with the problem of "successive representation" and discussion of such cases has thus dwelt on general strictures regarding confidential communications. See the remarks in the recent case of *Masiello* v. *Perini Corp.,* 394 Mass. 842, 847-850 (1985). See also Disciplinary Rule 4-101 (B) (2), appearing in S.J.C. Rule 3:07, 382 Mass. 778 (1981). In the cited case, the court observed (at 848 n.5) that there is widespread acceptance of the principle which

---

[3] Professor Kaufman, explaining the result in the *Mailer* case, spoke of weaknesses in the showing of an attorney-client relationship and of any confidences transmitted. Kaufman, *supra* at 131-132. In both respects the present case is stronger for disqualification.

appears as Model Rules of Professional Conduct Rule 1.9 (1983) awaiting consideration and possible adoption by the Supreme Judicial Court.[4] Under that principle, the case for disqualification on the facts herein is entirely clear.

3. *Borman* v. *Borman,* 378 Mass. 775, 778-781 (1979), held that an order disqualifying an attorney in a civil suit was appealable as "final" within the Massachusetts doctrine of "present execution." The court pointed out that that doctrine was analogous to the Federal doctrine of "collateral order" as described in *Cohen* v. *Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Now it appears that the Supreme Court of the United States, in the case of *Richardson-Merrell, Inc.* v. *Koller,* 472 U.S. 424 (1985), has held that a disqualification order is not to be treated as a collateral order capable of appeal as, in effect, a final decision. As Justices of the Appeals Court, we feel bound to follow *Borman* even though there be a possibility, remote or otherwise, that the Supreme Judicial Court may hereafter be attracted by *Richardson-Merrell* to the point of overruling *Borman*. (However, if the Supreme Judicial Court were to do this, the overruling would perhaps be declared not to invalidate appeals previously lodged in reliance on *Borman*.)

*Order disqualifying defendant's*
*attorney affirmed.*

BROWN, J. (concurring). I agree with the careful reasoning and clearly correct result reached by the majority. I, however, would reach that result more directly and more easily. Notwithstanding the status of Model Rules of Professional Conduct Rule 1.9 (1983) common sense and sound ethical practice dictate that in these circumstances counsel for the husband

---

[4] "A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; . . . ."

should have patterned his conduct along a similar line, and should have known enough not to have represented him.[1]

In my view, it would not lie in the mouth of an attorney, an officer of the court, to plead that an action is proper simply because no canon or disciplinary rule explicitly proscribes it.

"Professional responsibility" is something that cannot merely be "taught" in law school and "tested" on a multiple-choice examination. It is an ethic that must be nurtured and cultivated by every attorney during the entire course of his or her professional life. We must stake out the moral high ground by demanding sound and ethical judgments from our brothers and sisters at the bar. Without implying that the primary motivating factor in the present case was such, I think it important to assert that avarice must not be allowed to consume our profession.

---

[1] This case falls comfortably within the Supreme Judicial Court's admonition, cited in the majority opinion: "[I]n cases of doubt, counsel *must* resolve all questions against the acceptance of employment whenever such acceptance may impinge upon the interests of his present and former clients" (emphasis supplied). *Mailer* v. *Mailer,* 390 Mass. 371, 375 (1983).