DECISION
The matter is presently before the Court on Defendant Dr. Anthony L. Moulton, M.D.'s ("Dr. Moulton") Motion to Disqualify Plaintiff's trial counsel at Deluca Weizenbaum, Ltd. ("DW") from representing Plaintiff, Cathy Fedora ("Plaintiff"). This motion arises from DW's hiring and six-week employment of a paralegal formerly employed by Dr. Moulton's counsel at the law firm of Gidley, Sarli Marusak, LLP ("GSM").
 I Facts and Travel
This medical malpractice action was filed by counsel at DW on behalf of Plaintiff on November 9, 2007. From that date until September 18, 2008, GSM had employed Caryl Jardon *Page 2 
("Ms. Jardon") as a paralegal. This case was one of several that had been assigned to her during her employment with GSM. In her capacity as paralegal, and with regard to this action, it is undisputed that Ms. Jardon reviewed medical records; met with Dr. Moulton's trial counsel to discuss assignments and Dr. Moulton's trial theories; met with other counsel at GSM to discuss medical records; organized and indexed medical records; prepared a medical chronology from her review of the medical records; and communicated with staff from other offices involved in this matter, including staff from DW.
On September 18, 2008, Ms. Jardon left her employment with GSM. Approximately one year later, on September 14, 2009, DW hired Ms. Jardon as a paralegal. At or about that time, Dr. Moulton's trial counsel became aware of Ms. Jardon's new employment and contacted Plaintiff's trial counsel, requesting assurances that confidential information possessed by Ms. Jardon would not be utilized by DW.[1] Dr. Moulton's trial counsel followed up with two (2) letters to Plaintiff's trial counsel requesting those assurances. DW never responded to those letters. Additionally, GSM sent two (2) letters directly to Ms. Jardon requesting assurances of confidentiality. Ms. Jardon likewise failed to respond to those letters. Ms. Jardon's employment with DW was terminated on October 27, 2009, just six (6) weeks after her employment began.[2]
After several motions and hearings on unrelated discovery issues and scheduling conferences, Dr. Moulton's counsel filed the within Motion to Disqualify on November 30, 2009. It was only in objecting to the within motion that DW provided notice to Dr. Moulton and/or his counsel that Ms. Jardon's employment had been terminated. Moreover, in an Affidavit in Support of Plaintiff's Objection to the Motion to Disqualify, Plaintiff's co-counsel at DW maintained that reasonable efforts had been made to ensure that the firm had measures in *Page 3 
place so that Ms. Jardon was effectively screened from cases in which GSM was involved. The Plaintiff's co-counsel stated that "every case assigned to Ms. Jardon in which a party was represented by GSM was identified and removed from her assignment[,]" and that during the time of her employment, all paralegal work performed on the instant case was done by one Bianca Gray ("Ms. Gray"). (Affidavit dated December 7, 2009, at ¶ 4.) This information, however, had not previously been conveyed to GSM despite repeated written requests from Dr. Moulton's trial counsel.
Notwithstanding the screening process as so delineated in the December 7, 2009 Affidavit filed by Plaintiff's co-counsel, Ms. Jardon engaged in some correspondence with opposing counsel on October 20, 2009, concerning a matter from which Dr. Moulton's trial counsel alleges she should have been screened. Specifically, Ms. Jardon mailed to GSM deposition notice in a case which she entitled "Boettger v. Bullock, et al." ("the Boettger case").[3] Co-counsel for Plaintiff asserts that Ms. Jardon was permitted to work on that case only after GSM no longer was involved in the matter. Dr. Moulton's trial counsel, on the other hand, presented evidence that Ms. Jardon was not aware that GSM no longer was involved in the Boettger
case when she mailed the notice to GSM. Specifically, Doctor Moulton's trial counsel refers the Court to a second letter that Ms. Jardon mailed to GSM in the Boettger case where she had attached a "sticky note" to a GSM secretary stating, "Hi Charlene, Didn't realize you were out of case (old cert) CJ[.]" (Defendant's Exhibit C.) *Page 4 
 II Analysis
Before beginning its analysis, the Court first observes that our Supreme Court has not specifically addressed the ethical obligations of paralegals in the context of a Motion to Disqualify Counsel. Consequently, the Court will look to the Rhode Island Supreme Court Rules of Professional Conduct, as well as other jurisdictions interpreting similar rules of professional responsibility.
The disqualification of an attorney "is aimed to protect one attorney-client relationship, but . . . it also destroys another attorney-client relationship by depriving a party of representation of its own choosing. Motions to disqualify, therefore, should be viewed with extreme caution." Zimmerman v.Mahaska Bottling Co., 19 P.3d 784, 788 (Kan. 2001); seealso Daines v. Alcatel, 194 F.R.D. 678 (E.D. Wash. 2000) (observing that "[d]isqualification is `a drastic measure which courts should hesitate to impose except when absolutely necessary'") (quoting United States v. Titan Pacific ConstructionCorporation, 637 F.Supp. 1556, 1562 (W.D. Wash. 1986)). Accordingly, "[a] motion to disqualify counsel requires the court to balance the right of a party to retain counsel of his choice and the substantial hardship which might result from disqualification as against the public perception of and the public trust in the judicial system." Lamb v. Pralex Corp.,333 F.Supp.2d 361, 363 (D.Virgin Islands 2004).
The power of a Court "to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." Id. However, "the same `inherent power' also entitles the Court to deny a disqualification motion on condition that the attorney or firm in question comply with certain limitations." UMG Recordings, Inc. v. MySpace,Inc., 526 F.Supp.2d 1046, 1062 (C.D.Cal. 2007). The reason for this "is because a *Page 5 
court's authority to disqualify an attorney or craft appropriate relief to punish or deter attorney misconduct derives from the court's equitable powers." Id. (quoting Geoffrey C. Hazard, Jr. W. William Hodes, The Law of Lawyering: A Handbook on theModel Rules of Professional Conduct § 4.7, at 4-22 (Aspen, 3d ed. 2007)) ("Former clients in particular often pursue motions to disqualify their former counsel from adverse representation. Such motions . . . invoke the equitable powers of the court, and when successful result in an order that is in effect an injunction. Hence, . . . a motion for disqualification is governed by such equitable principles as waiver, estoppel, latches, `undue hardship' and `a balancing of the equities.' This helps explain why courts sometimes deny relief on motion for disqualification, even when there is clear proof of violation of a rule of professional conduct.").
In drafting the Rules of Professional Conduct, the Rhode Island Supreme Court recognized what the rules were designed to do:
 [14] The Rules of Professional Conduct are rules of reason. . . .
 . . .
 [20] The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.
Sup. Ct. R. Prof. Conduct, Art. V, "Scope."
Applying the Rhode Island Supreme Court Rules of Professional Conduct, the United States District Court for the District of Rhode Island denied a motion to disqualify and discussed disqualification in general: *Page 6 
 In deciding whether a party's counsel should be disqualified, a Court must balance the party's right to choose its counsel against the need to protect the integrity of the judicial process. Kevlik v. Goldstein, 724 F.2d 844, 850 (1st Cir. 1984). Disqualification is not a step to be taken lightly because courts have recognized that, in addition to delaying litigation and having a significant adverse effect on the client, such motions are often advanced for "tactical, not substantive, reasons." Moss v. TACC Intern. Corp., 776 F.Supp. 622, 623 (D. Mass. 1991). A party seeking disqualification of an opposing party's counsel bears a "heavy burden of proving facts required for disqualification." Evans v. Artek Systems Corp., 715 F.2 788, 792 (2nd
Cir. 1983); Jacobs v. Eastern Wire Prods. Co., 2003 WL 21297120, at *2 (R.I. Super., May 7, 2003) ("Because motions to disqualify are viewed with disfavor a party seeking to disqualify carries a heavy burden and must satisfy a high standard of proof.").
Haffenreffer v. Coleman,2007 WL 2972575, at *2 (D.R.I. 2007) (emphasis added).
This very concern had been echoed in the Rhode Island Superior Court on a motion to disqualify counsel:
 The Court notes at the outset an increasing tendency by counsel to invoke a claim of a breach of Rules of Professional Conduct in connection with contentious matters. Oft times it appears to the Court that the rules are used as a sword to preclude a parties' choice of counsel in litigation so as to attempt to gain a perceived tactical advantage rather than as a shield against inappropriate conduct where such conduct might inure to the detriment of the moving party in the dispute as well as to the public perception of the legal profession as a whole. . . .
 In order to obtain disqualification of counsel, a moving party carries a heavy burden and must satisfy a high standard of proof.
Weetamoe Condominium Ass'n v. Town of Bristol,2003 WL 21296848, at *2 (R.I. Super. May 7, 2003) (Silverstein, J.) (emphasis added).
A party seeking to disqualify an opposing party's counsel is not a tactic that is unique to Rhode Island attorneys. Courts in other jurisdictions have repeatedly held that motions for disqualification of counsel are disfavored as they separate a client from his or her choice of *Page 7 
attorney, inevitably cause delay, and can be used as a tactic for disruption of litigation. For instance, a Massachusetts court recently cautioned at great length:
 A party generally enjoys the right to counsel of his or her choice, see Mailer v. Mailer, 390 Mass. 371, 373, 455 N.E.2d 1211 (1983), and "courts `should not lightly interrupt the relationship between a lawyer and [a] client.'" Slade v. Ormsby, 69 Mass.App.Ct. 542, 545, 872 N.E.2d 223 (2007), quoting G.D. Mathews Sons Corp. v. MSN Corp., 54 Mass.App.Ct. 18, 20, 763 N.E.2d 93 (2002). The burden thus rests on the party seeking disqualification to establish the need to interfere with the relationship. Where, as here, it is opposing counsel who seeks disqualification, we must be "alert that the Canons of Ethics are not brandished for tactical advantage." Serody v. Serody, 19 Mass.App.Ct. 411, 414, 474 N.E.2d 1171 (1985). See Byrnes v. Jamitkowski, 29 Mass.App.Ct. 107, 109, 557 N.E.2d 79 (1990) (recognizing "repeated use of a disqualification motion as a litigation tactic"). We review the disqualification order for an abuse of discretion. See Serody, supra at 415, 474 N.E.2d 1171 (on motion to disqualify, "[s]izing up the potential for prejudice in a particular case and the degree of that prejudice involves the exercise of discretion by the trial judge").
Steinhart v. Steinhart,73 Mass.App.Ct. 287, 288, 897 N.E.2d 603, 605 (2008).
Similarly, the United States District Court for the Central District of California held:
 Courts have begun to register growing dissatisfaction with the use of disqualification as a remedy for ethical misconduct. It has been recognized that . . . judicial entry into the field of lawyer ethics through the medium of motions to disqualify has not been a salutary development. In part for this reason, it has been said that courts should not apply the ethical rules in a way that is mechanical, didactic, or inflexible. Courts have been admonished to take a `functional' approach, pursuant to which disqualifications are evaluated with a keen sense of practicality. . . .
 The discretion courts have to determine whether the specific facts of a case warrant a sanction short of disqualification is broad indeed:
 [E]ven when the court has misgivings about the conduct of the challenged attorney, it is not obligated to disqualify that lawyer merely because he has run afoul of the applicable ethical rules. The court is encouraged instead to examine the specific facts and *Page 8 
circumstances peculiar to the individual case to decide whether disqualification, or some lesser sanction, would be an appropriate remedy. In other words, even when counsel has been shown to have committed an ethical rule infraction the court retains discretion to decline to order disqualification, and, in many cases, courts have done just that.
UMG Recordings, Inc., 526 F.Supp.2d at 1062-63 (quoting Richard E. Flamm, Lawyer Disqualification: Conflicts of Interestand OtherBases § 23.1 at 443-45, and § 23.3 at 449-50 (Banks and Jordan, 2003)).
Doctor Moulton contends that DW's employment of Ms. Jardon created a conflict of interest triggering certain obligations under the Rhode Island Supreme Court Rules of Professional Conduct, and he maintains that DW failed to fulfill these obligations. Dr. Moulton relies on Article V, Rules 5.3, 1.9, and 1.10 of the Supreme Court Rules of Professional Conduct in support of his Motion to Disqualify. Rule 5.3 governs an attorney's responsibilities regarding nonlawyer assistants, and reads as follows:
With respect to a nonlawyer employed or retained by or associated with a lawyer:
 (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
 (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
 (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
 (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
 (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action. *Page 9 
Provisional Order No. 18, which appears immediately following Rule 5.3, identifies the work that may — and may not — be performed by a paralegal, and makes clear that the attorney supervising the paralegal is ultimately responsible for that paralegal's work.
When an attorney encounters a potential conflict with a former client through employment with a new firm, he or she becomes susceptible to the requirements of Rule 1.9, which provides:
 (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
 (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client[:]
 (1) whose interests are materially adverse to that person; and
 (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.
 (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
 (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
 (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.
Finally, Rule 1.10 addresses when a conflict of interest is imputed to the entire firm. Although Dr. Moulton relies on Rule 1.10(c)(1) — (2), it is necessary to provide Rule 1.10 in its entirety:[4] *Page 10 
 (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.
 (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
 (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
 (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter.
 (c) When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under Rule 1.9 unless:
 (1) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
 (2) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.
 (d) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.
 (e) The disqualification of lawyers associated in a firm with former or current government lawyers is governed by Rule 1.11.
In Daines v. Alcatel, 194 F.R.D. 678, 682 (E.D. Wash. 2000), the United States District Court for the Eastern District of Washington had occasion to review how Washington State's Rule 5.3, a provision similar to Rule 5.3 of the Rhode Island Supreme Court Rules of Professional Conduct, applies to paralegals. It concluded that Rule 5.3
 charges attorneys with the responsibility of ensuring that non-attorney staff members follow the same ethics rules that apply to attorneys. If those non-attorneys violate those ethical obligations, the supervising attorneys can be held responsible. It follows that if a non-attorney possesses confidences acquired in previous legal *Page 11 
employment but is not effectively screened by a new employer under RPC 1.10, [5] the new employer may be disqualified.
 This rule simply follows common sense. It is no secret that paralegals and other non-attorney staff members are regularly exposed to confidential client information as a part of their everyday work. Whether by such means as the filing of a confidential client letter in a case file or attendance at a strategical meeting, non-attorneys such as [a paralegal] often acquire sensitive information about their clients. To allow such employees to change firms at random and without concern for the information they have acquired would be to undercut the rules applicable to attorneys. RPC 5.3 recognizes that fact and this court will apply RPC 1.10's imputed disqualification rule to this case [involving a paralegal].
Daines, 194 F.R.D. at 682.
Rule 5.3 of the ABA Model Rules of Professional Conduct is almost identical to our own Rule 5.3. In reviewing that rule, the United States District Court for the District of the Virgin Islands stated:
 a law firm that hires a paralegal formerly employed by another law firm may continue to represent clients whose interests conflict with the interests of clients of the former employer on whose matters the paralegal has worked, so long as the employing firm screens the paralegal, and as long as no information relating to said clients is revealed to the employing firm.
Lamb v. Pralex Corp.,333 F.Supp.2d 361, 364 (D.Virgin Islands 2004) (citing Informal Opinion 88-1526 BNA Lawyers' Manual on Professional Conduct 901:318 (June 22, 1988)). The Lamb Court further commented:
 it is important that nonlawyer employees have as much mobility in employment opportunity consistent with the protection of clients' interests. To so limit employment opportunities that some nonlawyers trained to work with law firms might be required to leave the careers for which they have been trained would disserve clients as well as the legal profession. Accordingly, any restrictions on the nonlawyer's employment should be held to the minimum necessary to protect confidentiality of client information. *Page 12 
Id.
However, where a newly hired nonlawyer possesses confidential information of an opponent, "a rebuttable presumption arises that the information will be disclosed to the new employer."Id. at 365. Applying Model Rule 1.10, which is substantially similar to the Rhode Island Rule, "[a] party is able to rebut the presumption that confidential client information has been used or disclosed, by presenting evidence of effective screening mechanisms to shield the employee from the cases." Id. Accordingly, "the challenged attorney [or law firm] has the burden of showing that the practical effect of formal screening has been achieved and that the employee has not had and will not have any involvement with the litigation or any communication concerning the litigation."Id.
In the instant matter, the undisputed facts reveal that during her employment with GSM, Ms. Jardon reviewed medical records; met with Dr. Moulton's trial counsel to discuss assignments and defense theories; met with other counsel at GSM to discuss medical records; organized and indexed medical records; prepared a medical chronology from her review of the medical records; and communicated with staff from other offices involved in this matter, including staff from DW. In light of the foregoing, the Court finds and concludes that Ms. Jardon acquired material and confidential information and that there is a rebuttable presumption that this information was disclosed to DW. See id. at 365.
DW asserts that it established a screening mechanism to protect the confidential information. Pursuant to Rule 1.10, the Court now must resolve "(1) whether there is `convincing evidence' that no confidences were divulged before the screening mechanism was implemented and (2) whether the screening mechanism was `effective.'" Daines, 194 F.R.D. at 682. The Court also must determine whether Dr. Moulton, as the "former client," received *Page 13 
prompt written notice to enable him to ascertain DW's compliance with the provisions of Rule 1.10.
The record reveals that neither DW nor Ms. Jardon responded to Dr. Moulton's trial counsel's October 8, 2009 and October 30, 2009 written requests for assurances that Ms. Jardon would not be involved in, or communicate anything about, any of the cases that she had worked on during her employment at GSW. In the Affidavit, Plaintiff's co-counsel at DW attempted to explain her failure to respond to the communications from Dr. Moulton's trial counsel: when she received the October 8, 2009 letter, she already knew that Ms. Jardon's employment would be brief, and by the time she received the second letter, Ms. Jardon's employment at DW already had been terminated. Although the attorney in question may have considered that DW did not have to promptly inform GSM under the circumstances of this case, the prompt notice requirement in Rule 1.10(c) is mandatory and does not provide for any exceptions.
The Court finds that notice of any screening of Ms. Jardon was not provided to Dr. Moulton or his counsel until December 7, 2009, over six weeks from the first written communication from Dr. Moulton's trial counsel. Furthermore, said notice only was in response to the within Motion to Disqualify, rather than in response to Dr. Moulton's trial counsel's written requests. This Court would be stretching the bounds of reason to find that such notice was "prompt." Consequently, the Court concludes that DW failed to satisfy the "prompt notice" requirement set forth in Rule 1.10(c)(2) of the Rhode Island Rules of Professional Conduct.
Doctor Moulton asserts that DW did not effectively screen Ms. Jardon from cases upon which she previously had worked while employed by GSM. In support of this allegation, he points to correspondence from Ms. Jardon to GSM in the Boettger
case where she had attached a *Page 14 
"sticky note" to Dr. Moulton's trial counsel's secretary stating, "Hi Charlene, Didn't realize you were out of case (old cert) CJ[.]" Doctor Moulton then asserted that "while at DW, Ms. Jardon was working on a case, on behalf of the Plaintiff, in which she had previously worked while at GSM on behalf of the Defendant, andheld the belief that GSM was still involved in the case." (Defendant's Memorandum in Support of the Motion to Disqualify, at 6.) In response, DW asserted that the only reason Ms. Jardon was permitted to work on the Boettger case was precisely because GSM no longer was involved in the case.
With respect to whether DW provided effective screening, Plaintiff's co-counsel stated in her Affidavit that Ms. Jardon worked as a paralegal at DW from September 14, 2009 to October 27, 2009. She further stated that as the managerial and supervisory partner of the firm, she met with Ms. Jardon at the commencement of her employment and took measures to ensure that Ms. Jardon was effectively screened from any cases that involved GSM. Specifically, the attorney stated that steps were taken to identify and screen from Ms. Jardon all cases in which there were parties that were represented by GSM. Plaintiff's co-counsel further stated that all of the paralegal work in the instant matter was performed by another paralegal, namely, Ms. Gray.
The Court takes judicial notice that the court file in theBoettger case indicates that GSM withdrew its appearance on March 27, 2009, almost five-and-one-half months before Ms. Jardon began her employment with DW. Ms. Jardon's subjective belief that GSM still was involved in the case has no bearing on DW's duty to screen her from the GSM cases upon which she worked because, rather than being her responsibility, it was the responsibility of her supervisors to ensure compliance with Rule 1.10. SeeDaines, 194 F.R.D. at 682 (observing that Rule 5.3 "chargesattorneys with the responsibility of ensuring that non-attorney staff members follow the same ethics rules that apply to attorneys"); see also
R.I. Sup. Ct. R. Prof. Conduct, Provisional *Page 15 
Order 18, at 2(2) (work of paralegal ultimately is the responsibility of the supervising attorney). The fact that Ms. Jardon worked on the Boettger case after GSM withdrew from that case does not constitute evidence that DW did not effectively screen her from the other GSM cases upon which she had worked. The Court finds credible co-counsel's Affidavit concerning DW's screening procedures. It further finds that those procedures were effective and that there is no evidence that DW breached those procedures.
Consequently, there is nothing in the record to indicate that disqualification is necessary pursuant to Rule 1.10(c)(1). Although there is a rebuttable presumption that confidential information was disclosed, see Lamb,333 F.Supp2d at 365, there is nothing in the record to indicate that there were any improper disclosures of confidential information and, given the fact that DW no longer employs Ms. Jardon, there is no reason for the Court to believe that any such communications are likely to occur in the future. The Court concludes that although "prompt notice" was not provided to Dr. Moulton, DW did comply with Rule 1.10(c)(1) by timely and effectively screening Ms. Jardon from the instant matter. While the Court understands GSM's concern that Ms. Jardon took up employment with opposing counsel, the Court is satisfied that she did not disclose anything involving this case to DW. The Court is further satisfied that although Ms. Jardon communicated with GSM concerning a former client, she did so only after GSM was no longer involved in that matter. As a result, the Court concludes that DW effectively rebutted the presumption that confidential information had been divulged.
In light of the unique circumstances surrounding the subject-employee's lost employment and the high standard of proof that is required for an opposing party to move to disqualify counsel, and after balancing the equities and applying the "rules of reason" that the Rules of *Page 16 
Professional Conduct were meant to be, the Court denies the Motion to Disqualify in the instant case.
Although the Court concludes that there were no improper communications between Ms. Jardon and DW, the Court still is mindful of the fact that DW violated Rule 1.01(c)(2) by not promptly informing Dr. Moulton about Ms. Jardon's employment by DW. However, the party who would suffer if this Court were to grant the Motion to Disqualify would be Plaintiff, Cathy Fedora. If the Court granted the Motion to Disqualify, Plaintiff would be required to obtain substitute counsel while in the throes of discovery and facing an October, 2010 trial date certain.[6] Such disqualification likely would inflict upon Plaintiff an undue hardship by punishing her for something that she did not cause, namely, her counsels' violation of Rule 1.01(c)(2).
However, the Court also believes that DW should not go unpunished for its failure to adhere to Rule 1.01(c)(2). Had Plaintiff's counsel provided prompt notice at the outset, this matter likely would have been put to rest without the need to file a Motion to Disqualify, and likely by the time Ms. Jardon was terminated from her employment at DW. Accordingly, after a balancing of the equities, the Court orders as a sanction that DW pay Dr. Moulton the cost of pursuing the instant motion, including reasonable attorneys' fees as to the filing, briefing, and *Page 17 
argument on this motion. This sanction is imposed pursuant to the Court's equitable powers. See UMG Recordings, Inc.,526 F.Supp.2d at 1062 (observing that a Court may employ its equitable powers to impose sanctions that fall short of disqualification).
 III Conclusion
For the foregoing reasons, Defendant Dr. Moulton's Motion to Disqualify is denied. However, pursuant to its equitable powers, the Court imposes a sanction on DW for failure to follow the mandates set forth in Rule 1.10(c)(2). Said sanction shall consist of the reasonable attorneys' fees incurred by Dr. Moulton for pursuing the instant motion. Counsel for GSM shall submit to the civil motioncalendar justice an Affidavit in support of its calculation of said reasonable attorney's fees so that the civil motion calendar justice can assess the fairness of the fees.
An order consistent with this Decision shall be prepared by counsel for the moving party.
[1] The Court observes that there were seven (7) other pending cases which Ms. Jardon worked on while at GSM in which DW is counsel for plaintiff.
[2] The reason for Ms. Jardon's termination has not been disclosed by DW.
[3] The Court takes judicial notice that the "Boettger v.Bullock, et al." case actually should have been entitledBoettger v. Nahod, et al., Case No. PC/08-1235. However, the court file reveals that one of the defendants in that case did have the last name Bullock.
[4] Dr. Moulton asserts that Comment 4 to Article V, Rule 1.10 of the Supreme Court Rules of Professional Conduct specifically provides that disqualification is not required where the person prohibited from involvement is a nonlawyer such as Ms. Jardon. However, Comment 4 only applies to Rule 1.10(a), which governs conflicts that arise within a law firm rather than conflicts that result when a lawyer (or paralegal) moves from one firm to another. The latter situation is governed by Rule 1.10(c). Accordingly, this Court is not persuaded that Comment 4 governs the matter presently before the Court or DW's obligations under Rule 1.10(c).
[5] Washington State's Rule 1.10 is similar to our Rule 1.10.
[6] On the other hand, granting the Motion to Disqualify would afford Dr. Moulton little relief at this juncture because Ms. Jardon's employment has been terminated and there is no further threat that she will share confidential information concerning Dr. Moulton with DW. Put another way, denying Dr. Moulton's Motion to Disqualify will maintain the status quo and would not threaten the disclosure of confidential information. Furthermore, the decision to pursue the motion could be viewed as a tactical move by GSM to gain an advantage by disqualifying Plaintiff's trial counsel of choice. The Court observes that discovery, motions, and scheduling conferences proceeded after GSM discovered Ms. Jardon was employed by DW but before Dr. Moulton filed the instant Motion to Disqualify. The Court is curious as to why it took GSM almost three months after it first became aware that DW had employed Ms. Jardon to file the instant motion. See First Small Business Inv. Co. ofCalifornia v. Intercapital Corp. of Oregon,738 P.2d 263, 270 (Wash. 1987) ("With little to gain if the Court were to grant the motion, the decision to pursue the Motion could be viewed as a tactical move to gain an advantage by disqualifying Plaintiff's counsel of choice."). The Court does not reach the conclusion, however, that the Motion to Disqualify in fact was driven by tactics rather than the sincere concern of Dr. Moulton to protect his confidential information from being disclosed to opposing counsel.