**UNITED STATES of America,
Appellee,
v.
Thaddeus BIGOS, Defendant-Appellant.**

**UNITED STATES of America,
Appellee,
v.
Dennis RAIMONDI, Defendant-Appellant.**

**Nos. 71–1355, 71–1356.**

United States Court of Appeals,
First Circuit.

Heard March 6, 1972.

Decided May 1, 1972.

---

7. *Contrast* NLRB v. Gibbs Corp., 284 F.2d 403 (5th Cir. 1960) ; Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749 (4th Cir. 1949).

Joseph C. Delcore, Everett, Mass., and Anthony W. DiCecca, Somerville, Mass., with whom Alfred Paul Farese, Everett, Mass., was on brief, for defendants-appellants.

Frederick W. Read, III, Atty., Dept. of Justice, with whom Lincoln C. Almond, U. S. Atty., and Sidney M. Glazer, Atty., Dept of Justice, were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

On the night of January 4, 1971, a truck belonging to Merit Dress Delivery Co., Inc. and traveling between Fall River, Massachusetts, and Madison, Connecticut, was hijacked in Providence, Rhode Island. Defendants Raimondi, Bigos, McDonald and four others were indicted for hijacking the truck (Count I) and for conspiracy to do the same (Count II).[1] McDonald's trial was severed. Bigos and the four others were convicted on both counts and Raimondi was convicted on the conspiracy count alone. Only Bigos and Raimondi are before us here.

The trial transcript is voluminous and we relate only those facts necessary for the resolution of these appeals. The government's principal witness was the co-conspirator McDonald. In addition to relating the details of the January 4 hijacking, he testified that the defendants met several times between July 1970 and January 1971 to plan the crime and that they intended to take a truck on December 22, 1970, but their plan was aborted

1. Count I charged violation of 18 U.S.C. §§ 2 and 659 (1970). Count II charged violation of 18 U.S.C. § 371 (1970).

when they were stopped by the Rhode Island State Police for a routine check.

■ On January 8, four days after the hijacking, the F.B.I. conducted a search of the property at 99 Tell Street, Providence, Rhode Island, and discovered the stolen clothing and piece goods. Five separate warrants, each designating a distinct portion of the Tell Street property,[2] were simultaneously issued on the basis of a single affidavit. The defendants contend that the warrants were issued without probable cause and that if probable cause existed at all, it existed only for a search of the first floor apartment. Thus they argue that the issuance of five warrants is equivalent to an impermissibly general search warrant. The affidavit in support of the warrants is based principally on information given by the driver of the hijacked truck.[3] Applying the two-pronged test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), we find that the instant affidavit contains sufficient facts for a neutral magistrate to conclude both that the informant, Furtado, was credible and that he obtained his information in a reliable manner. With respect to the substance of Furtado's story, the fact that he was an eye-witness to the unloading of the truck is sufficient. There is also evidence of his credibility. Initially we note that we are dealing not with a "faceless informer," Jones v. United

2. The five warrants designated the following areas: (1) the basement, (2) the first floor, (3) the second floor, (4) the third floor, and (5) the yard and outbuildings.

3. The affidavit provides in relevant part as follows:

"I, MARTIN P. CONLEY, a Special Agent for the Federal Bureau of Investigation, upon oath, make affidavit and say:

(1) That in the course of my official duties I have investigated the theft from interstate shipment of a truck, owned by Merit Dress Delivery Co., Inc.,
. . . . .
(2) I have personally interviewed the driver of said truck, Alfred Furtado, of 1152 West Main Road, Portsmouth, R. I., who stated to me that on the evening of January 4, 1971, he drove said truck from New Bedford, Massachusetts, enroute to Madison, Connecticut, via Interstate Routes 195 and 95, and that while enroute, on Route 95 in Providence, a blue Chevrolet automobile, which he recognized as belonging to Edgar McDonald, a mechanic at the Merit Dress Delivery Co., Inc. terminal in Fall River, Massachusetts, who was known to Furtado, pulled in front of said truck and forced it to stop. The said McDonald, by threats, forced Furtado to exchange places with him and to follow the truck now driven by McDonald, in McDonald's car, to a three-story wooden building on Federal Hill in Providence, R. I., where two unknown men assisted McDonald in transferring part of the load of said truck through a first floor kitchen window. Furtado stated to me that he saw woman's pantsuits and children's dresses, among other items, transferred from his truck into said building at this time. Furtado was then instructed to drive the truck and to follow McDonald's car to a rural location about 25 minutes away from said wooden building where the truck was abandoned by him on instructions of McDonald.

(3) While at the wooden building, one of the unknown men stated, substantially, that his sister lived 'upstairs.'

(4) On January 8, 1971, Furtado was driven to Federal Hill by your affiant and after viewing the area identified the building at 99 Tell Street, Providence, as the place into which part of the load of his truck was transferred on January 4, 1971.

(5) On the evening of January 7, 1971, McDonald told Furtado at said terminal in Fall River that the goods would be removed from the premises 'next week.'

(6) Furtado further stated that on December 22, 1970, McDonald made an attempt to steal a truck then driven by Furtado, but that such attempt was foiled when the truck was stopped by the Rhode Island State Police. I have made independent inquiry and have confirmed that said Police did in fact stop such truck on such date.
. . . . .
(10) Based upon my investigation, I have reason to believe and do so believe that the said clothing and textile material referred to in Appendix A is presently located upon the premises located at 99 Tell Street, Providence, R. I."

States, 362 U.S. 257, 273, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (Justice Douglas dissenting), but with a named individual who drove the hijacked truck. Part of his story was corroborated, and whether one views him as an innocent victim or a culpable participant, common sense dictates that there is sufficient reason to credit his identification of the Tell Street property. *See* United States v. Ventresca, 380 U.S. 102, 108–109, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965); *see also* United States v. Harris, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (Opinion of Chief Justice Burger, concurred in by Justices Black, White, and Blackmun). Since Furtado saw the goods going into the first floor apartment, there was probable cause to search at least that area.

■ Defendants' attack on the five warrants requires little discussion. We do not equate the issuance of five separate warrants with a single warrant for the entire property. Each warrant required an independent determination of probable cause, and that there may not have been probable cause to issue a warrant for some other portion of the property does not necessarily infect the validity of another warrant properly issued on the basis of the same information. Since only the search of the first floor proved fruitful, the defendants were not prejudiced by the search of the rest of the property and we need not determine whether there was probable cause for the other warrants.

■ The defendants argue that they were prejudiced by the government's nondisclosure of statements made by Furtado to the police and to the grand jury. The district court denied a pretrial motion for the production of evidence favorable to the defense on the basis of the United States Attorney's representation that he was in compliance with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At trial the government successfully resisted disclosing Furtado's statements on the ground that since he was a potential prosecution witness, under the Jencks Act, 18 U.S.C. § 3500 (1970), such disclosure was not required until he had testified. However, Furtado was not called by the prosecution. At the close of the government's case, his statements, including grand jury testimony, were made available to the defendants. Had the defense been prejudiced by this use of the Jencks Act to delay complying with the mandate of Brady v. Maryland until the last possible moment, we would indeed be faced with a difficult issue. However, the district court examined Furtado's statements and found that they were not exculpatory. While the favorable nature of these statements is at best highly conjectural, we prefer to rely on the fact that the delay in their disclosure in no way prejudiced the defendants. *See* United States v. De Leo, 422 F.2d 487, 498–499 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *see also* United States v. Sharpe, 452 F.2d 1117 (1st Cir. 1971). The substance of Furtado's statements was contained in Agent Conley's affidavit in support of his application for the search warrants. See note 3 *supra.* Since the defendants were fully apprised of the substance of these remarks and who made them, their preparation for trial was not impeded. Nor were the defendants hampered thereby at trial. The cross-examination of McDonald exceeds 500 pages and the suppressed statements suggest no conceivable line of questioning which had not already been thoroughly exhausted. In fact, once the defense received Furtado's statements, it made no effort to recall McDonald for further cross-examination. Finally, when Furtado was called by the defense, he repeated almost verbatim his testimony before the grand jury.

■■ Defendant Bigos contends that the court committed error in allowing the jury to consider against him McDonald's testimony that after he, McDonald, went before the grand jury, he

was threatened by Raimondi.[4] Bigos argues that since the conspiracy had terminated at the time this threat was made, this testimony was admissible only against Raimondi. *See* Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In *Grunewald* the Supreme Court found the record inadequate to support the view that there was an actual agreement to conceal, and it refused to imply one. The instant case is distinguishable from *Grunewald,* however, because here there was substantial real evidence that the original conspiracy included an explicit agreement to conceal the true facts of the hijacking. The plan to have Furtado give the police a phony story was neither subsequent nor subsidiary to the conspiracy. *Cf.* Grunewald v. United States, *supra.* McDonald testified that the conspirators agreed before the hijacking that Furtado was to tell a phony story, and he further stated that Raimondi called him on the day he was arrested offering $500 to induce Furtado to stick with the original story. The record also contains two affidavits signed by McDonald at the request of Raimondi and other defendants which can be construed as attempts to bolster Furtado's original account and to exonerate Raimondi, Bigos, and the others. On this record, we agree with the district court that Raimondi's threat was admissible against all the defendants as an act calculated to induce McDonald to stick with the original conspiracy. We note that it might have been preferable to charge the jury to limit its consideration of the threat to Raimondi alone unless it found that Bigos conspired to have Furtado give a false account to the police. The district court, however, gave instructions on termination[5] and the charge was otherwise more than adequate. In the absence of an objection to the charge or a request for a more specific instruction, we cannot say that the district court erred.

 Finally, defendant Raimondi contends that it was improper to allow McDonald's former attorney to invoke the attorney-client privilege with respect to a statement made by McDonald exculpating Raimondi. His principal argument is that the presence of McDonald's father when the statement was made, vitiated the privilege. While we agree that the presence of a third party commonly destroys the privilege, it does so only insofar as it is indicative of the intent of the parties that their communication not be confidential. We have reviewed the record carefully, and in view of the witness's testimony we cannot say that the district court abused its discretion in permitting the attorney to invoke the privilege. Furthermore, since McDonald's affidavit, which contained a statement almost identical to the excluded testimony, was already before the jury, we cannot see that Raimondi was materially prejudiced by its exclusion.

Affirmed.

---

4. "When I went to the Grand Jury I came back that night. I received a telephone call from [one of the codefendants] asking me if I went to the Grand Jury. I told him 'No.' He said, 'Well, there was a young girl on the Grand Jury who told her boy friend and he went up and tell Danny.' So I said, 'I didn't go.' And he said, 'Well, we all go through this once in a while.' I said, 'Yes, but I didn't go.' Then he hangs up. Then I got a call back when [another codefendant] was sitting in the kitchen and Danny Raimondi said, 'God help you and your children if you testified in the Grand Jury.'"

5. The termination of a conspiracy is usually an issue to be determined on the facts of the individual case, United States v. Sarno, 456 F.2d 875 (1st Cir. 1972), and is properly a jury question. The court's charge that "[S]tatements of any conspirator, which are not in furtherance of the conspiracy, or made before its existence, or after its termination, may be considered as evidence only against the person making them" was sufficient in the absence of a request for something more specific.