STATE

v.

**Nicholas PARI and Andrew F. Merola.**

**No. 79–486–C.A.**

Supreme Court of Rhode Island.

June 5, 1981.

Reargument Denied July 2, 1981.

Dennis J. Roberts, II, Atty. Gen., Henry Gemma, Jr., Charles D. Schrock, Sp. Asst. Attys. Gen., for plaintiff.

Charles J. Rogers, Jr., William A. Dimitri, Jr., Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal by the defendants, Nicholas Pari and Andrew F. Merola, from a judgment of conviction of murder in the first degree. The defendants were jointly indicted for the murder of Joseph Scanlon, which murder allegedly took place on April 3, 1978, in the city of Providence. A number of state witnesses testified that the victim had been friendly with the defendants over a considerable period but that he was suspected of having turned informer, and the defendants believed he had disclosed information about them to the police. Thereafter, according to witnesses for the state, the defendants lured the victim to a bar owned by defendant Merola at 140 Knight Street in Providence. While at the bar defendant Pari engaged in a physi-

cal struggle with the victim, and during this struggle defendant Merola shot the victim from behind. Testimony also indicated that Pari was wounded in the finger by the bullet.

The defendants raise fifteen major issues in support of their appeal. However, in light of our disposition, only two of these issues need to be considered. The factual underpinnings of each issue will be discussed in connection with the determination thereof.

■ First, defendant Pari asserts that the trial justice committed reversible error in denying his motion for judgment of acquittal on the charge of murder. It is well settled that a trial justice who is confronted with a motion for judgment of acquittal must view the evidence presented in the light most favorable to the state and must draw from such evidence all reasonable inferences that are consistent with the guilt of the accused. At that stage of the proceedings the trial justice cannot assess the credibility of witnesses or resolve conflicts in testimony. *State v. Roddy,* R.I., 401 A.2d 23, 32 (1979); *State v. Johnson,* 116 R.I. 449, 454, 358 A.2d 370, 373 (1976); *State v. Wilbur,* 115 R.I. 7, 15–16, 339 A.2d 730, 735 (1975). Applying this test to the evidence in the case at bar results in the inevitable conclusion that there was an abundance of evidence from which a jury might infer that defendants Pari and Merola caused the victim to be invited to the Merola bar with the preconceived intention of killing him. Defendant Pari could well be determined by the jury to have deliberately engaged in fisticuffs with the victim in order that defendant Merola might shoot Scanlon from behind. The fact that defendant Pari may have been struck by the fatal bullet in his finger could be determined by the jury, on the basis of the evidence presented, only to have resulted from an error in timing. Consequently, the trial justice was correct in denying the motion of defendant Pari for judgment of acquittal.

Both defendants contend that the trial justice committed reversible error in refusing to allow defendants to present a

member of the State Police Department who had been subpoenaed as a witness for the purpose of disclosing prior inconsistent statements of a Mrs. Sandra Surprise (Sandra) who had been a principal witness for the state.

Sandra had testified that she had known Joseph Scanlon from 1975 until the date of his decease. She asserted that she had lived with Scanlon for a time. She further testified that she accompanied the victim and defendant Pari to Merola's bar. She then witnessed the fight between Pari and the victim and the ultimate shooting of the victim by Merola. She further testified that she saw the decedent's body after a brief interval lying near the back door of the bar, covered in garbage bags, and tied about with rope. She also testified that defendant Merola gave her approximately $200 which had belonged to the victim, and that later defendant Merola in Pari's presence told Sandra that they had gotten rid of the victim's body and that it would never be found.[1] During the course of Sandra's cross-examination defense counsel asked her whether she had ever discussed the incident that she had witnessed in Merola's bar at 140 Knight Street with a state police officer. She denied having discussed Joseph Scanlon or his alleged disappearance with the trooper. During the course of pretrial discovery, defense counsel were furnished with a memorandum given by Trooper Alvin Pontarelli to his superior officer, Colonel Stone. This memorandum stated that Pontarelli had questioned Sandra concerning her knowledge of events surrounding the disappearance of Joseph Scanlon or his possible murder. In response to these questions the memorandum indicated that Sandra had stated that she did not know anything about such events.

When Trooper Pontarelli was presented as a witness, the trial justice had apparently already been informed that the witness intended to assert his privilege against self-incrimination. Therefore, the trial justice held a hearing outside the presence of the jury in order to determine whether the witness should be required to testify at the trial. During the course of this voir dire examination, the trooper asserted his privilege against self-incrimination to every question propounded to him, including his place of residence, the question of whether he was employed by the State Police, and questions asking whether he knew Sandra and whether Sandra had ever been questioned by him about the disappearance of Joseph Scanlon and further about any replies that she may have given to him. After determining that Trooper Pontarelli intended to assert his privilege against self-incrimination to every question asked, the trial justice excused him as a witness, rejected the offer of proof submitted by counsel for the defendants, including the memorandum of the interrogation submitted by Pontarelli to Colonel Stone and refused to allow defense counsel to present Pontarelli as a witness before the jury. In so doing, the trial justice committed prejudicial error.

Professor Wigmore states as a general rule that an ordinary witness, as opposed to a defendant, may be required to take the stand and to submit to inquiry concerning relevant facts that are otherwise admissible in evidence, and that if he chooses to assert a privilege against self-incrimination, it is incumbent upon the witness to assert the privilege in respect to those questions that are deemed to be incriminating. 8 Wigmore, *Evidence* § 2268 at 402–03 (McNaughton rev. 1961). This principle has been recognized by the Supreme Court of the United States in *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In that case the Court held that it was not error to allow the prosecution to present two witnesses before a jury in a criminal trial even though it was known that the witnesses intended to assert their privilege against self-incrimination in regard to certain of the questions propounded. Although the Court recognized that it might constitute prosecutorial misconduct to present a witness solely for the purpose of creating an inference of guilt to be drawn by the jury from the witness's asser-

[1]. The body of the victim, Joseph Scanlon, in this case was never recovered.

tion of his privilege against self-incrimination, the Court held that when a witness is presented in good faith with the expectation that he will be required to answer some of the questions propounded, it is not improper to present such a witness to the jury. *Id.* at 187–88, 83 S.Ct. at 1155–56, 10 L.Ed.2d at 284–85.[2]

It has also been held by the Supreme Court of the United States that the assertion of a privilege against self-incrimination does not end the inquiry. It is the function of the judge to determine whether the privilege is properly asserted. In this connection the trial justice cannot defer to fanciful assertions of a privilege by the witness. *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). In the course of the opinion, Mr. Justice Clark observed:

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *(Patricia) Blau v. United States,* 340 U.S. 159 [71 S.Ct. 223, 95 L.Ed. 170], (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States,* 244 U.S. 362, 365 [37 S.Ct. 621, 622, 61 L.Ed. 1198], (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers v. United States,* 340 U.S. 367 [71 S.Ct. 438, 95 L.Ed. 344], (1951), and to require him to answer if 'it clearly appears to the court that he is mistaken.' *Temple v. Commonwealth,* 75 Va. 892, 899 (1881)." 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124.

The rule enunciated in *Hoffman* was that the privilege should be sustained if it is not "perfectly clear" from a careful consideration of all the circumstances in the case that the witness is mistaken and that the answer cannot possibly have a tendency to incriminate. *Id.* at 488, 71 S.Ct. at 819, 95 L.Ed. at 1125. "It is well established that the privilege protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234, 240 (1972).

Although it is true that the privilege should be upheld if the answer to a question would create a link in a chain of evidence which might be utilized in order to prosecute the witness for criminal conduct, *Malloy v. Hogan,* 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653, 661 (1964), it is necessary that the trial justice make a determination of whether relevant questions could have a reasonable possibility of establishing the hazard of incrimination. *Hoffman v. United States, supra; State v. Hasney,* 115 R.I. 210, 213–14, 341 A.2d 729, 731 (1975); *Hummell v. Superior Court,* 100 R.I. 54, 59–60, 211 A.2d 272, 275 (1965); *In re Werner,* 46 R.I. 1, 5, 124 A. 195, 196 (1924); *Rosendale v. McNulty,* 23 R.I. 465, 465, 50 A. 850, 851 (1902). In the case at bar the trial justice simply accepted uncritically and without any such determination the statement of the witness and his counsel that the privilege would be asserted. We are of the opinion that it was "perfectly clear" that the portion of Pontarelli's testimony concerning his employment, his questioning of Sandra, the answer that she gave, and the report of such statement to Pontarelli's superior created no hazard of incrimination. It may be that Pontarelli's social relationship with Sandra could conceivably have incriminated him.[3] Under these circum-

---

2. In this case the method utilized by the trial justice in holding a hearing outside the presence of the jury in order to explore the scope of assertion of the privilege was a desirable technique in that it would permit an examination of the subject and an appropriate ruling by the trial justice in order that prejudice to the parties and to the witness would be minimized.

3. The incriminatory aspects of such a social relationship are not entirely clear; however, under the test applied in *Malloy v. Hogan,* 378

stances it was the duty of the trial justice to instruct the witness to answer those questions in which no possibility of self-incrimination was involved and to sustain the assertion of the privilege only in regard to those questions in which there was a hazard of self-incrimination.

 It was apparent that the principal portion contained in the offer of proof propounded by counsel for the defendants did not constitute a proper subject for interposition of the privilege. This testimony should have been presented before the jury. Furthermore, there is no question that the credibility of Sandra was a principal element in establishing proof of the guilt of the defendants beyond a reasonable doubt. Thus denying the defendants the opportunity to exercise their power of subpoena by presenting an impeaching witness before the trier of fact constituted a denial to the defendants of their right to compulsory process and their right to offer testimony as guaranteed by the Sixth Amendment to the Constitution of the United States. *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), wherein Chief Justice Warren enunciated the principle in declaring the right applicable to the states:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.* at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023.

It cannot be said in the light of the evidence in this case that such error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17

U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), this possibility would probably have sustained the assertion of the privilege since it might be

L.Ed.2d 705 (1967); *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

For the reasons stated, the appeal of the defendants is sustained in part, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.

BEVILACQUA, C. J., and SHEA, J., did not participate.

at least conceivable that the social relationship could involve certain misdemeanors.