**Carl Stephen ROSATI**

v.

**Kenneth KUZMAN.**

**No. 93–595–Appeal.**

Supreme Court of Rhode Island.

June 23, 1995.

David Cicilline, Providence, for plaintiff.

Paul J. Votta, Sjoberg & Votta, Warwick, for defendant.

OPINION

MURRAY, Justice.

This case comes before us on an appeal by the defendant, Kenneth Kuzman (Kuzman), from a Superior Court order permanently enjoining him from disclosing information protected by the attorney-client and work-product privileges. Kuzman avers that the trial justice erred in numerous respects in fashioning such an order. For the reasons stated below, we affirm the trial justice's order.

On September 12, 1990, plaintiff, Carl Stephen Rosati (Rosati), was indicted by the grand jury of Broward County, Florida, for murder and armed robbery. A week later Rosati retained the services of Rhode Island attorney John F. Cicilline (Cicilline). Prior to engaging Cicilline, Kuzman, Rosati's former high school wrestling coach, "volunteered" his services to Rosati's parents in an effort to aid Rosati. Sometime in late September 1990, Rosati's parents introduced Kuzman to Cicilline. In turn, Cicilline testified that he "formally asked [Kuzman] to do or perform certain functions in connection with the investigation * * *." Soon Kuzman began assisting Cicilline in interviewing witnesses, made trips to Florida to follow up on information Cicilline and he had received, and regularly assisted a private investigator hired by Cicilline to work on the case.

On February 5, 1992, the Florida indictments against Rosati were dismissed. Shortly thereafter two other individuals were indicted for the same crimes. On February 10, 1993, Kuzman was notified to appear for a deposition in connection with one of the cases of these two defendants. Fearing that Kuzman was going to divulge privileged information during the deposition, Rosati filed a

complaint and request for declaratory and injunctive relief in Rhode Island Superior Court. Specifically, Rosati sought permanent injunctive relief preventing Kuzman from disclosing any information deemed privileged under the attorney-client and work-product privileges.

After a hearing, during which Kuzman represented himself, the trial justice issued an oral order that subsequently merged into written order. The written order contained the court's finding that "the defendant Kenneth Kuzman, collected information and received communications from the plaintiff, Carl Steven Rosati, and those acting on his behalf and during said times the defendant * * * was acting as an agent of legal counsel for the plaintiff, John F. Cicilline, and other *legal counsel engaged by the plaintiff.*" Consequently, the order permanently enjoined Kuzman from divulging any communications "protected by the attorney-client relationship" as well as "any information, material, or other data whatsoever which constitutes the work product of counsel."

On appeal Kuzman now asserts that the trial justice erred by (1) finding that Kuzman was an agent of Cicilline, (2) failing to find that the presence of Rosati's parents during attorney-client conferences destroyed any claim to the attorney-client privilege, (3) failing to find that the attorney-client privilege was waived after disclosure of confidential communications to a third party, and (4) fashioning an overbroad order.

In the first issue on appeal Kuzman asserts that at no point during his involvement in the case did he become an agent of Cicilline *or any other attorney involved in the case.* Instead, Kuzman claims that he merely "volunteered" his services to Rosati and his parents prior to Cicilline's involvement. Therefore, Kuzman avers, that he is not bound by any attorney-client privilege existing between Rosati and Cicilline.

█ We note that in order to invoke the attorney-client privilege successfully, the following elements must be satisfied:

"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [a] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *State v. von Bulow*, 475 A.2d 995, 1004 (R.I.1984) (quoting *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.1978)).

The burden of establishing the existence of the attorney-client privilege rests on the party seeking to prevent disclosure of protected information. *von Bulow*, 475 A.2d at 1005. Specifically, the burden in the instant case was on Rosati to establish that Kuzman acted as an agent or a "subordinate" of either Cicilline or Rosati and therefore remains bound by the attorney-client privilege existing between Rosati and Cicilline. *Id.* at 1004; *see In re Grand Jury Investigation*, 918 F.2d 374, 386 n. 20 (3d Cir.1990) (presence of client's agent during confidential communications does not vitiate privilege).

█ We note that in order to categorize a person as a "subordinate" of an attorney for purposes of the attorney-client privilege, an agency relationship must exist between the attorney and that person. An agency relationship exists when three elements coalesce: (1) the principal must manifest that the agent will act for him, (2) the agent must accept the undertaking, and (3) the parties must agree that the principal will be in control of the undertaking. *Lawrence v. Anheuser–Busch, Inc.*, 523 A.2d 864, 867 (R.I.1987) (citing Restatement (Second) *Agency* § 1(1) comment b (1958)). The essence of an agency relationship is the principal's right to control the work of the agent, whose actions must primarily benefit the principal. *Id.* Applying these principles to the instant case, we are of the opinion that an agency relationship existed between Kuzman and Cicilline.

█ During direct examination Cicilline testified that "Kuzman * * * had volun-

teered to assist us in the defense of * * * Rosati" and that "[t]here came a time when I formally asked him to do or perform certain functions in connection with the investigation of that case, which he did." Cicilline stated that these tasks included interviewing witnesses, performing various investigative work, and reviewing documents. According to Cicilline, he also authorized Kuzman to visit Rosati at the prison to discuss matters related to the case. We believe such evidence clearly demonstrates Cicilline's intent and understanding that Kuzman would act on his behalf in helping to prepare Rosati's defense.

It further appears that Kuzman fully accepted his role as an agent of Cicilline. In a letter dated August 20, 1991, Kuzman told the then-incarcerated Rosati, "As you have seen since September, 1990 I have assisted Jack [Cicilline] in putting this case together. My role in this case was very important while we fought in Rhode Island. But that was just a practice match, now we are preparing for the finals and my role is getting much more important." At the hearing below Kuzman again explained his relationship with Cicilline:

"Q. So you were continuing to play a role in assisting John F. Cicilline in the representation of Carl Stephen Rosati?

"A. Critical role. Absolutely."

When examined in total, Kuzman's admissions, his performance of various investigative work concerning the case, and Cicilline's testimony at the hearing lead us to the conclusion that Kuzman fully accepted his role as an agent of Cicilline. See Baker v. ICA Mortgage Corp., 588 A.2d 616 (R.I.1991) (agent's acceptance of agency relationship may be inferred from the circumstances).

Lastly, we believe that on the evidence there existed an implicit agreement between Cicilline and Kuzman that Cicilline was in control of the undertaking. In fact Kuzman himself provided a glimpse of this aspect of their relationship while questioning Cicilline at the hearing below

"Q. Did you ever *authorize me* [Kuzman] to go to the F.B.I. on behalf of Carl Stephen Rosati?

*    *    *    *    *    *

"A. I had some question in my mind as to what the effect of F.B.I. interference was going to be. I didn't think they would be able to produce anything or assist us in any way, but I think, yes, I did say its okay to go talk to the F.B.I. about it." (Emphasis added.)

As we previously noted, Kuzman admitted numerous times and in varied contexts that his role in the case was to assist Cicilline. Finally, during testimony Cicilline unequivocally stated that he directed and guided Kuzman as his agent.

Although Kuzman now counters that he offered his services to Rosati's parents shortly before Cicilline became Rosati's attorney, this alleged occurrence simply has no impact upon the determination of an agency relationship between Cicilline and Kuzman. As soon as the three elements noted in *Lawrence* coalesce, an agency relationship exists. Therefore, after reviewing the record, we are of the opinion that the trial justice did not err in finding that an agency relationship existed between Cicilline and Kuzman. *See Forte Brothers, Inc. v. Ronald M. Ash & Associates, Inc.,* 612 A.2d 717 (R.I.1992) (Superior Court order warrants reversal only when trial justice misapplied the law, misconstrued or overlooked material evidence, or made clearly erroneous findings).

Kuzman next contends that the presence of Rosati's parents during communications between Cicilline and Rosati destroyed any attorney-client privilege. We disagree.

■ As we noted in *von Bulow, supra,* the attorney-client privilege may be waived through disclosure of a confidential communication to a third party. 475 A.2d at 1005. However, the mere presence of a third party per se does not constitute a waiver thereof. Given the nature of the attorney-client privilege, the relevant inquiry focuses on " 'whether the *client* reasonably understood the conference to be confidential' " *notwithstanding* the presence of third parties. (Emphasis added.) *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984) (quoting *McCormick on Evidence,* § 91 at 189 (1972); *see von Bulow,* 475 A.2d at 1005 (communication is

privileged if expressly intended to be confidential). Therefore, the identity of the third party becomes relevant in aiding such a determination. *See, e.g., State v. Juarez,* 570 A.2d 1118, 1120 (R.I.1990) (presence of polygraph examiner at attorney-client meeting failed to waive privilege as examiner was agent of attorney).

■ With these principles in mind we turn to the facts of the instant case to determine the intent of Rosati. Our review of the record unequivocally reveals that Rosati intended that communications between him and Cicilline remain confidential and included the presence and participation of Rosati's parents. In fact Rosati's parents occupied a vital role in his defense: they helped procure the services of Cicilline, accepted Kuzman's offer to assist in the case, and otherwise remained invaluable confidants to Rosati through a tense legal proceeding. Therefore, we are of the opinion that the presence of Rosati's parents during meetings between Rosati and Cicilline failed to create any expectations that communications as among the participants in the instant case were not confidential. We are not persuaded that the privilege was vitiated. *See e.g., United States v. Bigos,* 459 F.2d 639 (1st Cir.1972) (presence of client's father during meeting between attorney and client failed to destroy privilege).

■ Kuzman further contends on appeal that any attorney-client privilege that may have existed was waived. Specifically Kuzman avers that Cicilline's authorization of him to communicate with the FBI and Florida authorities as well as Rosati's authorization to contact literary agents concerning the case resulted in a waiver of the attorney-client privilege. Kuzman reaches this conclusion by relying heavily on our statement in *von Bulow* that " '[A] disclosure of, or even merely an assertion about, [a privileged] communication may effect a waiver * * * not only as to that communication, but also as to other communications made * * * at other times about the same subject.' " *von Bulow,* 475 A.2d at 1007 (quoting *United States v. Aronoff,* 466 F.Supp. 855, 862 (S.D.N.Y.1979)).

Kuzman also avers that any privilege was waived when Rosati assented to the disclosure of certain information but subsequently invoked the privilege in an effort to prevent damaging disclosures. Again he relies on a statement we made in *von Bulow* that "[a] party may not, therefore, insist upon protection of the privilege for damaging communications while disclosing those which it considers to be favorable to its position." *von Bulow,* 475 A.2d at 1007 (quoting *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 551 (D.C. 1981)).

In *von Bulow* an attorney retained by the son and the daughter of an alleged murder-attempt victim asserted the attorney-client privilege on behalf of his clients as a shield from a subpoena duces tecum. 475 A.2d at 1003–04. The attorney had been hired by the son and the daughter to investigate the suspicious circumstances surrounding their mother's sudden lapse into a coma. During the course of his investigation, the attorney accumulated numerous documents and information that were subsequently turned over to the Rhode Island State Police. These disclosures eventually led to a full-scale State Police investigation into the circumstances surrounding the mother's coma and ultimately led to defendant's indictment on two counts of assault with intent to murder.

During our analysis in *von Bulow* we noted that the attorney's disclosure of information to the Rhode Island authorities was with the specific consent of his clients. 475 A.2d at 1006. We also stated that given the quantum of the attorney's disclosures, it was "difficult to imagine that confidential communications were not disclosed during the course of the ongoing meetings between" the attorney and the Rhode Island authorities. *Id.* at 1007. We further indicated that the clients' assent to certain *privileged* disclosures favorable to their position and subsequent assertion of the privilege to prevent disclosure of damaging revelations constituted an inequitable and impermissible use of the attorney-client privilege. *Id.* As such we held that the attorney-client privilege had been vitiated.

In the instant case our search of the record fails to reveal that any of the allegedly authorized disclosures made by Kuzman

were confidential or even implicated confidential communications thereby vitiating the attorney-client privilege. For example, Kuzman testified at the hearing below that he made authorized disclosures of confidential information to numerous literary agents in an effort to publicize and profit from Rosati's predicament. To support this assertion, Kuzman submitted into evidence a general cover letter sent to literary agents that proclaimed Rosati's innocence and railed against the "corrupt Broward County Sheriff's Department." The second page of the letter stated that the following items were included with the letter for the agents' review: an outline of Rosati's background, all relevant newspaper articles, the Florida indictment cover page, Rosati's "dance photographs," and other nonconfidential information. We note that Kuzman does not specifically cite any confidential communications that were revealed with authorization. Although we are mindful that by its very nature the attorney-client privilege often hinders a determination of whether confidential communications have been disclosed, nonetheless there must exist some indicia that a privileged and authorized communication has been *either* actually disclosed or that there has at least been an assertion concerning a privileged communication sufficient to constitute a waiver. *von Bulow,* 475 A.2d at 1007.

We also find nothing in the record to indicate that Cicilline or Rosati assented to disclosures of certain privileged information to achieve particular goals but now seek impermissibly to protect the revelation of other damaging confidences. *See von Bulow,* 475 A.2d at 1007. As we have previously stated in this opinion, the record yields no disclosure or definitive assertion concerning a privileged communication in the instant case. *Id.* The record in the instant case fails to reveal any of the peculiar inequities that prompted us to prohibit the selective use of the attorney-client privilege in *von Bulow.* In *von Bulow* we noted that the holders of the attorney-client privilege assented to the disclosure of a large quantity of information leading to the indictment of the defendant for the attempted murder of his wife, who was also the mother of the clients. However, when the defendant, in an effort to exonerate

himself, sought all the information that the attorney had gathered, the clients suddenly invoked the privilege. In the instant case there has been no persuasive claim of *any* hardship, even if we were to find that Rosati selectively used the privilege. Instead, the privilege has been invoked merely to prevent Kuzman from disclosing privileged information during a deposition for a case in which he is not a party.

■ In the last issue on appeal Kuzman avers that Rosati failed to specify to the trial justice the particular confidences that he wished to protect and that the trial justice erred in issuing an oral order so vague that it impermissibly put the burden on Kuzman of knowing whether he has violated the court's order. We disagree.

With regard to Kuzman's first contention, we believe that Rosati adequately specified the communications that he sought to protect through his assertion of the attorney-client privilege. In his prayer to the trial justice below, counsel for Rosati asked the court to fashion an order that "would *restrain Mr. Kuzman* from disclosing * * * information he obtained directly from Carl Steven Rosati or from his counselors that he learned during the course of his assistance to Mr. Cicilline and in that representation." Given the peculiar nature of the attorney-client privilege, we believe a more particularized prayer would have exposed the very information that Rosati sought to protect through assertion of the privilege. Therefore, we are of the opinion that Rosati's prayer sufficiently detailed the communications sought to be protected. *Cf. In re Cumberland Investment Corp.,* 120 B.R. 627 (Bankr.D.R.I.1990) (claimant of privilege made only unsubstantiated and self-serving statements concerning the alleged confidentiality of unidentified communications without specificity in regard to either time or subject matter).

Although Kuzman argues that the oral order issued by the trial justice was impermissibly vague, he failed to object to the order before it was merged into the written order. The written order states quite clearly that information learned through Kuzman's investigation as an agent of Cicilline that had not

already been divulged remains protected. During the hearing below and in response to a statement by Kuzman, the trial justice stated that "[a]nything that [Rosati] disclosed you can talk about to your heart's content. * * * Anything that [Rosati] disclosed to anyone who interviewed him or to any third party, sir, is something that you're free to comment upon in anyway you wish." We are of the opinion that the written order is not impermissibly vague. Kuzman's doubts about the privileged status of any communications may be explored by petition to the Superior Court for instructions.

We believe Kuzman's remaining claims and assertions raised in this appeal are without merit.

Kuzman's appeal is denied and dismissed. The written order of the Superior Court permanently enjoining Kuzman from divulging privileged information is affirmed.

BOURCIER, J., did not participate.