DECISION
Defendant Kimberly Mawson is before this Court following the June 10, 2010 remand by the Supreme Court. By that order our high court instructed this Court to consider Mawson's motion for new trial based upon newly discovered evidence. After numerous chambers conferences, consideration of written memoranda of law and oral argument, as well as hearing testimony and receiving exhibits on two occasions, this Court granted the motion, staying its effect for a thirty day period during which any aggrieved party could apply for appellate relief. This decision will serve to memorialize this Court's findings and reasoning for granting Defendant's motion.
In 2007, Defendant Mawson was convicted after jury trial of the 2002 murder of her nineteen-month-old child, Jade. This Court sentenced Mawson after denying her motion for a new trial by a written decision. She promptly appealed her conviction and the sentence of this Court. However, following oral argument incident to her direct appeal, but before the Supreme Court issued its decision with respect to the appeal, a series of events occurred which brought the case again before this Superior Court. *Page 2 
 I. Facts and Travel
On May 27, 2010, Attorney Richard Corley ("Attorney Corley" or "Corley") contacted the Supreme Court's Disciplinary Counsel, indicating that he wished a consultation regarding an ethical dilemma. At a subsequent face-to-face meeting with Disciplinary Counsel, Attorney Corley disclosed information which he felt to be required under his ethical obligation to his bar licensure, necessary to the interests of justice, and allowed pursuant to In re Instructions from Disciplinary Counsel,610 A.2d. 115 (R.I. 1992).
In sum, Corley reported that days after the December 2002 death of Jade Mawson he met with both Kimberly Mawson and Daniel Fusco (Daniel) (together with their respective fathers) concerning issues for which both desired legal representation and advice. As detailed in a letter dated June 3, 2010, from Disciplinary Counsel to the Attorney General and counsel for Defendant Mawson (Hr'g Ex. C), Corley sensed a conflict of interest in representing both Daniel and Ms. Mawson. Because of a prior relationship with Fusco, Corley told the two that he would consult with and represent Daniel. Mawson was advised to get her own attorney.
The initial meeting between Attorney Corley and Daniel was uneventful. Daniel essentially denied any responsibility for the demise of Jade Mawson. However, as reflected in the June 3 letter, and more fully developed factually at the hearings on the instant motion, Daniel met a second time with Attorney Corley. In response to a telephone call from Michael Fusco ("Michael"), father of Daniel, Corley met with both Daniel and Michael in his law office on December 13, 2002. Although there is a conflict *Page 3 
between the recollection of Michael and that of Attorney Corley, this Court finds that Corley's memory of the meeting is the more accurate.
As suggested by the June 3 letter and explained in some detail during testimony given by Corley on September 30, 2010, both Michael and Daniel were in his presence when Daniel related a version of events concerning the demise of Jade Mawson which was vastly different than previously disclosed. After reading from a Bible while demonstrating substantial anxiety and distress, Daniel advised Corley that he, Daniel, was responsible for the death of Jade Mawson. Daniel and Attorney Corley then discussed whether Daniel would go to the Warwick Police Department and advise that police agency of this information. Daniel never went to the police. Rather, as is demonstrated from the totality of the record, Daniel subsequently testified before the grand jury and later the trial jury that he had absolutely nothing to do with the 2002 murder of or physical injuries to baby Jade. Corley made no disclosure concerning the information provided to him by his client until some seven and one-half years later.
Almost immediately following the receipt of their copy of the June 3 letter, the Attorney General disclosed at least parts of the letter to the Warwick Police Department. That department immediately interviewed both Daniel and his father, Michael. In fact, Daniel was interviewed on that very day, June 3, 2010, by the same detectives who had been principally involved in the original investigation of Jade's death.
A transcript of the police interview of Daniel at the Warwick Police Station was received by this Court during the hearing held on September 14, 2010. Exhibit B. A review of that transcript, the authenticity and accuracy of which is not seriously contested by the parties, reflects that Daniel was under arrest at the time, had been provided his *Page 4 Miranda[1] warnings, and was advised that the police wished to speak with him concerning their long-standing investigation of Kimberly Mawson. When advised of the purpose of the interview, Daniel stated, "I don't want to discuss much, but I will tell you one thing and one thing only." From the outset Fusco indicated that "advice from my lawyer was not to discuss anything with anyone for any reason whatsoever." Almost immediately thereafter he explained why it was that he did not want "to answer any questions."
It is clear under the law that at the time of his June 3, 2010, interrogation, Daniel Fusco was not only under arrest for another crime but he had probably invoked his right to speak with or at least have his attorney present during questioning. He clearly invoked his Fifth Amendment right to remain silent. Once a suspect invokes his right to remain silent or to speak with an attorney, the police must cease all questioning. SeeMiranda 384 U.S. at 473-74.[2]
As previously noted, Michael Fusco is the father of Daniel. He was also a trial witness. Shortly after their first meeting with Attorney Corley, Daniel made certain statements to Michael that caused the latter to contact Corley to arrange for a second legal consultation. Corley recalls meeting with the Fuscos on the day after being contacted by Michael. Although there is some record evidence through the transcript[3] prepared of Michael Fusco's interview by the Warwick Police on June 4, 2010, to the effect that he was not immediately present during the attorney-client conversation on December 13, 2002, Corley's recollection is to the contrary. Corley recalls Michael being present in his inner office while incriminating disclosures were made by Daniel. There is *Page 5 
no question that at the time Daniel met with Attorney Corley in the presence of Michael, the conversation was for the purpose of legal advice and was — at that time — protected by the attorney-client privilege.
On June 4, 2010, the day following the Warwick Police interview of Daniel, Michael met with the same detectives and provided an extensive statement with respect to the issues surrounding the investigation of the death of Jade Mawson. It is clear that during that interview, Michael advised the Warwick Police that his son had disclosed to him that he was somehow responsible for the baby's death. (See Ex. A, presented to the Court on 9/14/2010 — accepted as a full Exhibit on 9/30/2010.)
In preparation for hearings on the instant motion for a new trial, this Court appointed counsel for both Daniel Fusco and Michael Fusco. Both of these witnesses were called to testify on September 14, 2010, and, upon advice of counsel, invoked their Fifth Amendment testimonial privilege. This Court finds that the invocation of the privilege by both of these witnesses was taken in good faith. Obviously, if the comments made to Attorney Corley on December 13, 2002, by Daniel are true, any testimony by him at this point would potentially inculpate him with respect to the murder of Jade Mawson not to mention a variety of other crimes committed incident to his sworn testimony at both the grand jury and trial.
The propriety of the invocation of the Fifth Amendment testimony privilege by Michael is less clear. Michael refused to testify based upon advice of his extremely experienced attorney. Independent of that attorney's opinion and advice, this Court finds that Michael's prior testimony, his close affiliation with Daniel, and his knowledge of inculpatory statements by his son strongly suggest that Michael could be charged relative *Page 6 
to suborning perjury or obstruction of justice[4]. Accordingly, this Court finds that Michael does have a legitimate Fifth Amendment right not to testify in these proceedings.
With neither Michael Fusco nor Daniel Fusco available to support her motion for a new trial based upon newly discovered evidence — Daniel's statement of culpability in the death of Jade — Defendant Mawson has sought to compel the testimony of Attorney Corley. Counsel for Daniel as well as the State (in essentially an amicus role) object to this Court compelling testimony by Attorney Corley. Daniel claims (and the State expresses concern) that Daniel has an enforceable attorney-client privilege which only he can waive. Further, Daniel and the State assert that there has been no waiver: express, implicit, or resulting from conduct.
Arguing to the contrary, Defendant Mawson asserts that the attorney-client privilege has been or should be declared waived. At the heart of the matter is Mawson's claim that without Corley's testimony, she will be wrongly convicted of murder because neither Michael Fusco nor Daniel Fusco is available to her as a witness. However, this Court need not decide whether, under the facts presented here, Defendant's constitutional due process rights trump Daniel Fusco's attorney-client privilege[5].
This Court well understands that there is a difference between a disclosure of confidential information and a waiver of the attorney-client privilege. The attorney-client privilege is a long standing and important part of our legal system[6]. In its purest form, *Page 7 
the attorney-client privilege exists to protect communications made solely between the client and the attorney — there being no third person present. In such a situation, the attorney is bound to secrecy. The client is secure in knowing that only he or she has the power to divulge whatever secrets may have been shared. However, as is often the case, reality does not always conform with the idyllic models of our legal principles. In these situations, the courts must strive to reconcile the real with the ideal.
The presence of third parties during attorney-client communications complicates the application of the attorney-client privilege. In some instances the presence of a third party will destroy the privilege and in others it will not. Courts throughout the country have struggled to find uniformity in the application of the privilege with resolution of many cases hinging on the particular facts at issue. One might even observe that a body of case law has emerged that occasionally stands at odds with itself.
 II. The Issues
As has been obvious from the outset of these post trial proceedings, this Court must preliminarily determine whether Attorney Corley may testify concerning statements made to him by Daniel Fusco incident to their attorney-client relationship. Only then will this Court be in a position to decide the pending motion. In the instant case the attorney-client communications occurred in the presence of a third person, the client's father. At issue before this Court is what effect Michael's presence had on the existence of the privilege, who held that privilege if it did exist, and ultimately, who has the power to waive that privilege. *Page 8 
 III. Analysis
A. Presence of Michael Fusco during the confidential communications did not waive the attorney-client privilege.
In Rhode Island, Our Supreme Court has recognized that the presence of a client's parents during meetings between the client and her attorney does not necessarily waive the attorney-client privilege. Rosati v. Kuzman, 660 A.2d 263 (R.I. 1995). The Court found that the relevant inquiry in these situations focuses not on whether a third party was present, but on "whether the client reasonably understood the conference to be confidential notwithstanding the presence of third parties."Id. at 266 (quoting Kevlik v. Goldstein,724 F.2d 844, 849) (internal quotations omitted). In making such a determination, the identity of the third party is relevant.Id. at 267 (citing State v. Juarez,570 A.2d 1118, 1120 (R.I. 1990)).
In this case, it is evident that Daniel understood that his communications with Attorney Corley were confidential. Under the circumstances, that understanding was reasonable. The third party was his father — a party whose presence has been held in the past not to waive the privilege. United States v. Bigos,459 F.2d 639 (1st Cir. 1972). Of course, it was Daniel's father who had arranged for the attorney conference in the first instance.
B. Presence of a third party and the possibility that such a party might break confidentiality is a risk that the client bears the burden to protect against. *Page 9 
Courts have recognized that, "[i]t is the client's responsibility to insure continued confidentiality of his communications." In reVon Bulow, 828 F.2d 94, 101 (2d Cir. 1987). In the case entitledIn re Grand Jury Investigation of Ocean Transp.,604 F.2d 672, 675 (D.C. Cir. 1979), the D.C. Circuit stated, "The risk of insufficient precautions [against involuntary disclosure] is upon the client." Id. (citations omitted). An involuntary disclosure can waive the attorney-client privilege, even if client had no desire to waive the privilege. Id. ("An intent to waive one's privilege is not necessary for such a waiver to occur"). "[I]f a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality."In re Von Bulow, at 101 (quoting Judge Friendly, In reHorowitz, 482 F.2d 72, 82 (2d Cir. 1973)).
In this case, Daniel chose to include a third party participant/observer in the confidential communications. In making that choice, Daniel forfeited the security of knowing that only he had the power to break the confidentiality of the communications. The possibility that his father might at some future time disclose protected communications to third parties was a risk that Daniel took — a risk which he bore the responsibility to guard against. Daniel's failure to properly inform his father that he was not to, nor could he be forced to, disclose anything said during those privileged communications, [7] constitutes a failure on Daniel's part to take the necessary affirmative action to preserve confidentiality. See: In re Von Bulow,828 F.2d 94 (2d Cir. 1987); In *Page 10 re Grand Jury Investigation of Ocean Transp.,604 F.2d 672, 675 (D.C. Cir. 1979); In re Horowitz,482 F.2d 72, (2d Cir.), cert. denied, 414 U.S. 86 (1973).
C. The party claiming the privilege bears the burden of establishing the elements of the privilege as well as demonstrating that the privilege has not been waived.
"An essential element that must be proved in establishing the existence of the privilege is that it has not been waived. . . . It is well settled that the burden of establishing these elements is on the party advancing the privilege." State v. Von Bulow,475 A.2d 995, 1005 (R.I. 1984) (citations omitted). Daniel has failed in this regard.
D. Michael Fusco's statements to the Warwick Detectives constitute a disclosure that amounted to a waiver of Daniel's attorney-client privilege.
In the case of In re Grand Jury Investigation of OceanTransp., the D.C. Circuit considered what effect an accidental disclosure to government investigators of privileged documents — made by an attorney[8] and against the intentions of the client — had on the continued protection of those documents. In consideration of the fact that the documents had been "copied, digested and analyzed" by investigators, the court ruled that "it is clear that the mantle of confidentiality which once protected the documents has been so irretrievably breached that an effective waiver of the privilege has been accomplished."Id. at 674-675. *Page 11 
The facts of In re Grand Jury Investigation of OceanTransp. are not incongruous to those presented here. Both cases involve disclosures of privileged information by persons other than the client — disclosures that the clients did not intend. Despite the clients' nonacquiescence, because those disclosures destroy the confidentiality of the communications, they constitute a waiver of the attorney-client privilege. See Id. Whether or not Michael was acting as an agent of Daniel or merely as a third party to the communications does not change the fact that his choice to disclose breached the confidentiality of the communications and waived the privilege. Michael had the right to "withhold or to disclose, but after a certain point his election must remain final."State v. Von Bulow,475 A2d 995, 1008 (R.I. 1984) (citation omitted)
This Court need not address what effect any prior disclosures by Attorney Corley may have had on the attorney-client privilege. All that needs be determined by this Court is whether the communications at the time of the hearing continue to be protected under the attorney-client privilege. It is clear to this Court that they are not.
Assuming arguendo that a privilege existed at the time Michael Fusco was questioned by police, his choice to disclose the subject information vitiated whatever privilege Daniel may have previously possessed. Had Michael chosen not to disclose, the issue of what effect prior disclosures may have had would be relevant. However, at this juncture, what effect any prior disclosures may have is moot. Daniel chose to bring Michael into a conference in which Daniel disclosed highly confidential communications to his attorney. Michael subsequently chose to disclose the substance of that information. This Court finds that Michael's disclosure of that information to the police constitutes a waiver of Daniel's privilege. That Michael's actions went against the intentions of *Page 12 
Daniel, the privilege holder, does not change the result. Daniel Fusco assumed the risk of unwanted disclosure and a waiver of his privilege when he chose to bring his father into the otherwise private, attorney-client consultation. "There [must be an] objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not." Id. at 675 (quoting 8 Wigmore, Evidence § 2327 (McNaughton rev. 1961). Michael's disclosure to police investigators reached that point.
E. Attorney Corley's testimony.
It has been settled law for over a century that once the privilege has been waived, the attorney is free to testify as to the communications. Hunt v. Blackburn, 128 U.S. 464 (U.S. 1888).
As detailed above, Michael engineered the legal representation of Daniel by Attorney Corley. The Court finds that Michael was present during confidential attorney-client discussions between his son and Corley and overheard the disclosures concerning which Mawson wishes to present to the Court and another jury[9]. Even Michael Fusco admitted to the Warwick Police earlier this year that he brought his son to Corley's office and was able to overhear, at least in general terms, the conversations between Corley and his son. Michael, at least in part, disclosed those potentially highly incriminating comments by his son to the Warwick Police. This Court finds that these acts result in a waiver of the attorney-client privilege. This is because Daniel knew that his father *Page 13 
possessed this sensitive information because his father was present during the attorney-client conversations Daniel had with Corley in December 2002.
By having a third party present during his attorney-client conversations, Daniel took the risk that the individual — here his father — might disclose those sensitive conversations. In fact, Michael did just that. This Court finds that these acts result in a waiver of the attorney-client privilege as it relates to the consultations between Corley and Daniel Fusco regarding the death of Jade Mawson.
 IV. Granting the Motion for New Trial
This Court has found that the attorney-client privilege previously enjoyed by Daniel Fusco regarding his 2002 conversations with Richard Corley is no longer valid. The question then becomes whether or not Corley's testimony as summarized in the June 3, 2010, letter and his testimony before the Court on September 30, 2010, constitutes newly discovered evidence warranting a new trial.
In State v. Briggs, 886 A.2d 735, 759-60 (R.I. 2005) our high court stated:
 "The test for whether newly discovered evidence warrants a new trial has two prongs. First, the evidence must be analyzed under the following four elements: (1) the new evidence must have been discovered since trial; (2) even with the exercise of due diligence, the evidence was not discoverable prior to trial; (3) the evidence must be material, and not merely impeaching or cumulative; and (4) the evidence must be so crucial that the jury probably would have acquitted the defendant. State v. Luanglath, 863 A.2d 631, 639 (R.I. 2005). Second, the trial justice then must exercise his or her independent judgment to determine whether the newly discovered evidence is sufficiently credible to warrant vacating a jury conviction. *Page 14 
There is no question that the proffered evidence satisfies the first three elements. Although there can be much speculation as to the veracity of Daniel's admissions to Corley in December 2002, the fact that one of the only two people possibly culpable of the murder of Jade has admitted to the killing — a fact unknown to the jury which convicted Defendant Mawson — must be viewed as "so crucial that the jury probably would have acquitted the defendant."Briggs.
This is a case in which the entirety of the defense at trial was to show that Daniel Fusco was the killer. He was alone with the baby at the time she collapsed, falling into a coma from which she never recovered. Given these facts as well as the totality of the trial record and the evidence presented at hearings on the instant motion, this Justice is compelled to find that the newly discovered evidence is sufficiently credible to warrant a new trial.
The State argues that even if Corley is allowed to testify as to his conversations with Daniel, the incriminatory statements made to him during legal consultations would be inadmissible hearsay evidence regarding any proceedings against Defendant Mawson. Thus, the State argues that Attorney Corley's testimony cannot constitute "newly discovered evidence." This Court disagrees.
As held in State v. Tavares, 461 A.2d. 390 (R.I. 1983), a case upon which Defendant Mawson relies, our Supreme Court reversed a denial for a motion for a new trial based on newly discovered evidence and ordered a retrial based exclusively on the representations of counsel made before the trial court. Thus, the State's argument that the independent admissibility of Corley's testimony is a pre-requisite to finding that it is newly discovered evidence within the meaning of Super. R. Crim. Pro. 33 and case *Page 15 
authority is without merit. Moreover, even if the Court found that the State's position as to this evidentiary issue is correct as a matter of law, that conclusion would not bar the Defendant relief.
Before the Court explains it reasoning in this regard, it will state the obvious. This Court is not making any ruling that will in any way speak to whether Attorney Corley will be able to testify at either a retrial of Defendant Mawson or any other legal proceeding. That decision is solely up to the trial judge assigned to preside over such proceedings. However, this Court is not at a loss in predicting how Corley's testimony could become admissible.
It is clear to virtually anyone familiar with the facts concerning the demise of Jade Mawson that she was murdered either by her mother (the Defendant), or Daniel Fusco, or both of them. For the State to retry Defendant Mawson, the State must call Daniel as a witness. Daniel was the principal witness against Ms. Mawson at the first trial. Given recent developments, he will presumably be unavailable to the State by reason of his invocation of his Fifth Amendment, testimonial privilege. Thus, the State will be required — and presumably be allowed — to place Daniel's testimony from the first trial before a second jury. That evidentiary presentation would open the door to Corley's testimony as to what Fusco told him in late 2002 concerning Jade's demise. Unlike many other jurisdictions, the prior statement of a witness may be considered by a Rhode Island jury for any purpose. Accordingly, the substance of Corley's testimony may be regarded as admissible, newly discovered evidence.[10] *Page 16 
 V. Conclusion
In sum, this Court finds that the testimony potentially available through Attorney Corley concerning the statements made to him by former client Daniel Fusco satisfy the test for newly discovered evidence which requires a new trial. See State v.Briggs, 886 A.2d at 759. This Court reaches this conclusion despite the state's observation — one that this Court likewise makes — that Daniel's "confession" is factually at odds with the trial evidence presented by the medical examiner. See State of Rhode Island's Memorandum of Law Addressing the Attorney-Client Privilege at 5 n. 1.
This Court well recognizes that the issue regarding the attorney-client privilege waiver — as presented in the context of this case — is one of apparent first impression in the State of Rhode Island. In that this Court found a waiver of the privilege over the objection of Daniel Fusco, this decision will be stayed for a thirty day period from September 30, 2010, during which time Daniel Fusco may exercise whatever right he has to review by the Rhode Island Supreme Court.
[1] See Miranda v. Arizona, 384 U.S. 436 (1966).
[2] The police did not terminate questioning at this point. However, there is nothing contained in the statements given by Daniel Fusco on this occasion that exculpates Defendant Mawson.
[3] Hearing exhibit A.
[4] The Fifth Amendment testimonial privilege extends not only to disclosures that would support a conviction, but also to disclosures that would constitute a link in the chain of evidence needed to initiate a prosecution. See e.g., State v. Pari,430 A.2d 429 (R.I. 1981).
[5] See Kimberly Mawson's Memorandum of Attorney-Client Privilege at 7-8.
[6] Rhode Island law recognizes the common law attorney-client privilege. See State v. Grayhurst,852 A.2d 491, 512 (R.I. 2004). R.I. R. Evid. 501. As pointed out byamicus, this ancient doctrine is essential to the just and orderly operation of the legal system. However, "[b]ecause the attorney-client privilege limits the full disclosure of the truth, it must be narrowly construed." State v. VonBulow,475 A.2d 995, 1005-06 (R.I. 1984) (Citations omitted).
[7] Although client's father was brought before police for questioning, he had the right to have counsel present during that questioning (and if he was not under arrest, he had the right to leave). Had Michael requested counsel, an attorney could have properly informed him that he need not (indeed should not) answer police questions. Daniel's failure to inform his father that he should request counsel during any questioning on the subject of the protected communications, constitutes an additional failure of client to take the necessary affirmative steps to protect the confidentiality of the communications.
[8] The court determined that the attorney was acting as an agent for the client in determining which documents to disclose and which to keep confidential.
[9] Even Michael Fusco admitted to the Warwick Police earlier this year that he brought his son to Corley's office and was able to overhear, at least in general terms, the conversations between Corley and his son.
[10] It would appear that the state would first have to call Daniel Fusco as a trial witness in order to offer him an opportunity to deny or explain his 2002 statement to Attorney Corley.See Rule 613(b) and State v. LaPlume,375 A.2d. 398 at 943 n. 5 (R.I. 1977).